[No. B220763. Second Dist., Div. Six. June 23, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ASHLEY JOHNIGAN, Defendant and Appellant.

**COUNSEL**

Sanger & Swysen, Robert M. Sanger and Stephen K. Dunkle for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson, Steven E. Mercer and Ana R. Duarte, Deputy Attorneys General; and Susan P. Stone for Plaintiff and Respondent.

**OPINION**

**YEGAN, Acting P. J.**—On the evening of May 1, 2008, Laura Cleaves was at the wrong place at the wrong time. Appellant, Ashley Johnigan, drank the equivalent of 16 alcoholic drinks at a Santa Ynez bar and struck and killed Cleaves on Highway 154. Appellant refused multiple offers for a safe ride home, was warned that she was too drunk to drive and could harm people, and knew the mountain road was very dangerous to drive. Shortly before the collision, appellant stopped her Mercedes on the road shoulder with the left tires in the traffic lane. California Highway Patrol officers arrived to provide assistance but appellant sped off, driving on the road shoulder. Reaching a speed of 70 miles per hour, appellant swerved across the road, and struck two oncoming vehicles, killing Cleaves and injuring Lisa Raines.

Johnigan appeals her conviction by jury for second degree murder (count 1; Pen. Code, §§ 187, subd. (a), 189), gross vehicular manslaughter while intoxicated (count 2; Pen. Code, § 191.5, subd. (a)), driving under the influence of alcohol (count 3; Veh. Code, § 23152, subd. (a)), and driving with a blood-alcohol content of 0.08 percent or more (count 4; Veh. Code, § 23152, subd. (b)). Appellant was sentenced to 15 years to life in state prison and ordered to pay $1,056,201.58 victim restitution. (Pen. Code, § 1202.4, subd. (f).) Appellant contends that the evidence is insufficient to support the murder conviction and the trial court committed jury selection and instructional error. We affirm.

*Facts*

On the evening of May 1, 2008, appellant met Amanda Sebern and Jessica Perez for drinks at the Maverick Saloon. Appellant arrived at 7:30 p.m., consumed at least five alcoholic drinks, and took sips from other people's drinks. She became progressively intoxicated and was acting "wild, crazy, [and] just having a good time." Appellant stumbled into patrons and claimed she was fine. A women said "No, you're not" and offered to help. Appellant was "very drunk" and "wanted to do her own thing, be on her own."

Sebern and Perez prepared to leave and offered appellant a ride home at 10:00 p.m. Appellant decided to stay and "party." Julie Wilks, the bartender's sister, saw that appellant was drunk and offered her a ride home. Appellant said she was "okay" and could drive.

At 10:45 p.m., the bar refused to serve her any more alcohol. Appellant stumbled outside and fell on Sarah Cliffe. Cliffe warned appellant, "You can't drive. You could hurt yourself. You could hurt somebody else. You are too drunk to drive." Cliffe drove for a taxicab company and offered appellant a free cab ride home as they walked by two cabs in the parking lot.

Appellant refused to take a cab and got into her Mercedes. Cliffe asked for the car keys. Appellant promised not to drive and asked Cliffe to get her a glass of water. The bartender called 911 as appellant drove out of the parking lot.

California Highway Patrol Officers Toby Hall and Cliff Powers saw the Mercedes on a straight section of Highway 154 about four miles from the bar. Appellant had stopped her car with the engine running on the side of the road but was partially blocking the traffic lane.

Officer Hall pulled up behind the Mercedes, activating the patrol car's left front spotlight, the clear overhead lights, and a rear-facing amber light. As the officers approached with flashlights, appellant looked in the rearview mirror and sped away. The officers yelled "Stop" and followed the Mercedes with their red, yellow, and blue "code three" lights and alternating headlights activated, reaching a speed of 70 miles per hour. Appellant drove on the road shoulder, bouncing up and down and kicking up dirt for half a mile. As the Mercedes approached a right curve, appellant veered left, crossed two traffic lanes, and drove over the double yellow centerline at a speed of about 70 miles per hour. Appellant hit Laura Cleaves head on, killing her. She sideswiped a second vehicle, injuring Lisa Raines.

Appellant was ordered to stay in the Mercedes until the officers checked the other motorists. When Officer Hall returned, appellant had crawled out the driver's window and entangled herself in a barbed wire fence. She smelled of alcohol, had red watery eyes, and said that she was drunk and just wanted to go home. Inside the Mercedes, officers found a two-liter Sierra Mist bottle containing a liquid that had a strong pungent alcohol odor. Appellant said that she had "one shot of tequila, about two hours ago" at the Maverick Saloon but did not remember what happened after she left.

Appellant provided a blood sample, which was tested and had a blood-alcohol content (BAC) of 0.24 percent, three times the legal limit. Ventura

County criminalist Janet Anderson-Seaquist testified that a person matching appellant's weight and drinking timeline would have to consume 16.5 standard one-ounce alcoholic drinks to reach a 0.24 percent BAC.

## Prior Warnings

Prior to May 1, 2008, appellant had been warned on numerous occasions that she could injure or kill someone if she drove while intoxicated. In 2007, appellant tried to pick her daughter up at Rumi Koizumi's house and drive home while intoxicated. Koizumi refused to let appellant drive with the child in the car. Appellant took her daughter across the street to a relative's house and stayed the night.

On a second occasion, appellant was again intoxicated and drove to Koizumi's house. Koizumi's husband, Matt Doyle, told appellant, "If you want to kill yourself, go ahead, but I'm not going to let you put [your] child in the car." Appellant argued with Doyle but he would not allow her to take the child. Doyle looked outside a few minutes later and saw that appellant had driven away.

In 2008, appellant and Koizumi were out drinking and left a bar. Appellant was intoxicated, had trouble staying in the traffic lane, and almost hit another car. Koizumi told appellant to stop and warned her that "You could hurt someone. It could be me. It could be anyone else."

On April 29, 2008, just two days before she killed Cleaves, appellant drank beer and gin at Amanda Sebern's house. Sebern asked if she was "okay to drive." Appellant said she had driven drunk before and that "someday it might get [me] into trouble."

## Defense Case

Dr. Katherine Emerick, a psychologist, testified that appellant suffered from alcohol dependency, had abused cocaine and methamphetamine in the past, and suffered from posttraumatic stress disorder (PTSD) due to sexual assaults in her teen years. She opined that appellant had an "exaggerated startle response" the night of the crash.

Appellant testified that her plan was to visit the bar, drink, and drive home. Appellant put alcohol in the Sierra Mist bottle before going to the bar. After appellant arrived at the bar, two men gave her a dirty look and were in the parking lot when she left. Appellant drove off "to go somewhere else, to be safe." Appellant knew she was drunk and that it would be "very dangerous" to drive.

Appellant decided to take Highway 154 where the "cops patrolled" and stopped on the highway to sober up. Moments later, she saw lights come up behind her. Appellant sped off, fearing it was the men from the bar.

On cross-examination, appellant denied that Sebern and Perez offered her a ride home, denied that she was offered a free cab ride home, denied that Julie Wilks offered her a ride home, denied that she was warned about the danger of driving drunk, and denied that she saw a police vehicle with red and blue emergency lights chasing her before the crash. Appellant admitted that she was "very intoxicated," knew that she was too drunk to drive, and knew that driving under the influence of alcohol was dangerous to human life and especially dangerous if the driver is heavily intoxicated. Appellant also knew that the 19-mile drive home would be difficult to navigate because Highway 154 was a dark, winding, high-speed road.

*Implied Malice*

Appellant argues the evidence does not support the conviction for implied malice second degree murder. As in any sufficiency of the evidence appeal, we review the record in the light most favorable to the prosecution and draw all reasonable inferences in support of the judgment. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].) "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*Ibid.*)

■ California courts have long recognized that a traffic fatality caused by a grossly intoxicated motorist may support a conviction for second degree murder. (*People v. Watson* (1981) 30 Cal.3d 290, 300–301 [179 Cal.Rptr. 43, 637 P.2d 279] (*Watson*); see *People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d 135], and cases cited therein.) " 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Watson, supra*, 30 Cal.3d at pp. 300–301.)

Appellant contends that implied malice requires a "predicate act," such as a prior conviction for driving under the influence (DUI) or an alcohol-related collision. Before the traffic fatality, appellant had never been cited for DUI, had an alcohol-related accident, or attended a drunk driver education program. Appellant relies on *Watson* and other cases in which the defendant's prior DUI conviction or a near-miss with other vehicles established the "accused's awareness of the life-threatening risks of drunk driving." (*People v. Murray* (1990) 225 Cal.App.3d 734, 744 [275 Cal.Rptr. 498] [U-turn and

wrong way driving on freeway]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 534 [224 Cal.Rptr. 846] [four prior DUI convictions].)

We hold that there is no requirement of a "predicate act," i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice. "[W]e read *Watson* as deliberately declining to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach. If the Supreme Court had intended the factors in *Watson* to be required in all cases for a second degree murder conviction, it presumably would have said so. Instead, the court simply described the distinction between vehicular man-slaughter and vehicular second degree murder, and applied the law to the particular facts in that case." (*People v. Olivas* (1985) 172 Cal.App.3d 984, 989 [218 Cal.Rptr. 567].)

■ The evidence does not show, as a matter of law, the absence of implied malice. Appellant's plan was to drive to the Maverick Saloon, drink with friends, and drive home alone. Appellant consumed an excessive amount of alcohol, was warned that she was too intoxicated to drive, was warned that she could harm someone, and turned down offers for a safe ride home. After the bar stopped serving alcohol to appellant, she twice refused a free cab ride and was warned that she could injure someone if she drove. Appellant promised not to drive, asked for a glass of water, and drove away.

"A high level of intoxication sets the stage for tragedy long before the driver turns the ignition key. 'There is a very commonly understood risk which attends every motor vehicle driver who is intoxicated. [Citation.]' " (*People v. Bennett* (1991) 54 Cal.3d 1032, 1038 [2 Cal.Rptr.2d 8, 819 P.2d 849].)

It is uncontroverted that appellant drove four miles and stopped on the highway, partially blocking the traffic lane. When officers arrived, appellant sped off reaching a speed of 70 miles per hour. The officers gave chase with their emergency lights activated as appellant bounced up and down on the road shoulder for half a mile, and swerved across two lanes, hitting Cleaves head on.

Appellant admitted that she was "very intoxicated" and that it was "very dangerous" to get behind the wheel and drive. Based on appellant's admis-sions, her plan to drink and drive, her refusal to take a free ride home, the police chase, and the prior warnings both before May 1, 2008, and on the evening of May 1, 2008, that she could hurt or kill someone if she drove drunk, a reasonable trier of fact could find that appellant acted with implied malice.

Our recent opinion in *People v. Moore* (2010) 187 Cal.App.4th 937 [114 Cal.Rptr.3d 540] (*Moore*) is instructive. There, the defendant drove 70 miles

per hour in a 35-mile-per-hour zone, ran a red light, and struck another motorist causing a traffic fatality. Moore was sober, told the police he did not intend to kill anyone, and was convicted of second degree murder. (*Id.*, at p. 940.) We affirmed, holding that the act of driving 70 miles per hour in a 35-mile-per-hour-zone, crossing into the opposing traffic lane, and running a red light "went well beyond gross negligence. . . . [¶] Whether Moore was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk." (*Id.*, at p. 941.)

In our view, appellant's conduct was more egregious than Moore's conduct. Unlike Moore, appellant was grossly intoxicated, knew it would be very dangerous to drive, was warned not to do so, and sped away after the police stopped to provide assistance. But like Moore, it took no leap of logic for the jury to conclude that appellant acted with conscious disregard of life and with wanton disregard of the near certainty that someone would be killed. "[T]he state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas, supra*, 172 Cal.App.3d at p. 988.)

### Alleged Instructional Error

Appellant asserts that the jury was not adequately instructed on the difference between second degree murder and gross vehicular manslaughter while intoxicated. The trial court gave the approved CALCRIM instructions which were accurate statements of the law and complete. (CALCRIM Nos. 520, 590; Cal. Rules of Court, rule 2.1050(e).) The trial court did not err in declining to give special defense instructions which were argumentative and would have confused the jury.[1] (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Bolden* (2002) 29 Cal.4th 515, 558–559 [127 Cal.Rptr.2d 802, 58 P.3d 931].) Defense

---

[1] The trial court declined to give a special defense instruction that stated: "The distinction between 'conscious disregard for life' and 'conscious indifference to the consequences' is subtle but nevertheless logical." (Special jury instruction No. 2.) Appellant also asked the court to instruct: "The term 'gross negligence' as used in the definition of manslaughter in these instructions *means the failure to exercise any care, or the exercise of so little care* that you are justified in believing the defendant was wholly indifferent to the consequences of her conduct and to the welfare of others." (Special jury instruction No. 4, italics added.) The proposed instruction contradicted the CALCRIM No. 590 instruction on gross vehicular manslaughter while intoxicated which stated: "*Gross negligence* involves more than ordinary carelessness, inattention or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury. [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

counsel agreed that CALCRIM Nos. 520 and 590 are "something both sides want" and stated that appellant was submitting "competing" special instructions that were "a work in progress."

■ The proposed defense instructions contradicted CALCRIM Nos. 520 and 590 and suggested that gross vehicular manslaughter while intoxicated was a lesser included offense of second degree murder. "[G]ross vehicular manslaughter while intoxicated should not be treated as a lesser included offense of murder . . . [;] a defendant may be convicted of both offenses arising out of the same act . . . ." (*People v. Sanchez* (2001) 24 Cal.4th 983, 992 [103 Cal.Rptr.2d 698, 16 P.3d 118].)

Appellant argues that the trial court erred in not giving a sudden emergency instruction on count 2 for gross vehicular manslaughter while intoxicated. The bracketed "sudden and unexpected emergency" language in CALCRIM No. 590 states: "A person facing a sudden and unexpected emergency situation *not caused by that person's own negligence* is required only to use the same care and judgment that an ordinarily careful person would use in the same situation, even if it appears later that a different course of action would have been safer." (Italics added.)

Here the "emergency" was caused by appellant who drank to excess, refused offers for a safe ride home, attempted to drive home drunk, and stopped on the highway with the left side of the vehicle in the traffic lane. Appellant knew she was very intoxicated and decided to drive on Highway 154 because the police patrolled it. Assuming, arguendo, that the officers presented an "unexpected emergency" by stopping to render assistance, the emergency was created by appellant's wanton and reckless conduct. There was no substantial evidence to merit a sudden and unexpected emergency instruction. (See, e.g., *People v. Crew* (2003) 31 Cal.4th 822, 835 [3 Cal.Rptr.3d 733, 74 P.3d 820].)

Appellant complains that the instruction on gross vehicular manslaughter while intoxicated fails to state that the jury should consider appellant's actual awareness of the risk of harm.[2] Appellant, however, did not object to the

---

[2] Appellant asserts that the prosecution compounded the instructional error by arguing that the jury "could not consider the relevant facts actually known by the defendant for the gross vehicular manslaughter charge." This misstates the record. The prosecution argued that the PTSD evidence could theoretically negate a finding of implied malice for second degree murder, but "there's no rule of law that says if someone has been sexually assaulted, that they get to go out and drive drunk . . . . Prior abuse is just not an excuse. It doesn't matter whether the defendant . . . had ever suffered from post-traumatic stress. The relevant inquiry is whether or not any assault and any resulting stress caused the defendant to believe that she was afraid for her safety the night of May 1st, 2008." This was a correct statement of the law. (See *People v. Whitfield* (1994) 7 Cal.4th 437, 466 [27 Cal.Rptr.2d 858, 868 P.2d 272].)

CALCRIM No. 590 instruction or request that it be modified to state that subjective awareness of the risk of harm may be considered in determining gross negligence. Waiver aside, an instruction on subjective awareness would misstate the law because the mental state for gross vehicular manslaughter is not subjective. " 'The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

The court in *Ochoa* concluded that a prior DUI conviction or past attendance at a DUI alcohol awareness class was relevant to show that the defendant was aware of the danger of driving while intoxicated. (*People v. Ochoa, supra*, 6 Cal.4th at pp. 1205–1206.) "[T]he trier of fact could conclude from defendant's course of conduct and preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions. Applying the objective test for gross negligence, any reasonable person in defendant's position would have been aware of the risks presented by his conduct. [Citation.]" (*Id.*, at p. 1208.) The *Ochoa* court in no way suggested that the jury should be instructed to base its ultimate finding of gross negligence on subjective awareness.

Appellant claimed that CALCRIM No. 590 controlled and that the prosecution, in discussing gross vehicular manslaughter while intoxicated, "can argue about an ordinary person, but they cannot say you can't consider information in Ms. Johnigan's mind at the time, or her state of mind at the time . . . ."

For clarification, the prosecution asked: "[U]sing [CALCRIM No.] 590, can I argue that the evidence of the sexual assault doesn't apply to count two [gross vehicular manslaughter while intoxicated]?" The court responded, "No . . . . You argue the facts. The law is in black and white on the board. You argue what you think the facts are that apply to particular statements of law, but don't state the law. The law is what I give them."

Assuming, arguendo, that the trial court should have instructed on subjective awareness, the error was harmless beyond a reasonable doubt. (*People v. Flood* (1998) 18 Cal.4th 470, 504 [76 Cal.Rptr.2d 180, 957 P.2d 869].) The jury found appellant guilty of implied malice second degree murder, rejecting defense evidence that appellant suffered from PTSD, faced an emergency situation, feared for her safety when she drove away from the officers, or suffered an exaggerated startle response. Had the jury been instructed to consider subjective awareness on count two for gross vehicular manslaughter while intoxicated, it is not reasonably probable that appellant would have

received a more favorable outcome. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

*Alleged Prosecutorial Misconduct*

Appellant claims the prosecution deliberately called criminalist Janet Anderson-Seaquist to falsely testify that alcohol impairs the brain's ability to form memories. Anderson-Seaquist opined that if an intoxicated person was unable to recall something from short-term memory, it was unlikely the event imprinted on the brain and could be remembered at a later date. On cross-examination, defense counsel asked, "I want to know what study you are relying on. Is there any study anywhere that says that?" The trial recessed for the day before Anderson-Seaquist answered.

Anderson-Seaquist was examined out of the presence of the jury the next day and said that she had "perused" some scientific articles on alcohol and memory impairment that supported her opinion testimony. The articles were short abstracts and not on point. The trial court found that Anderson-Seaquist was "overreaching," "trying to be cute," and "unfairly exuberant to give information without following the traditional protocol." Appellant moved to strike the testimony on the ground that the defense was not provided discovery or notice that Anderson-Seaquist was "going to get up there and all of a sudden blurt out this preposterous opinion."

The trial court struck the expert testimony about the effect of alcohol on memory and instructed the jury to disregard it. The jury was specifically admonished that the testimony was outside the scope of Anderson-Seaquist's expertise.[3] Appellant did not object or assign prosecutorial misconduct. She is precluded from raising the issue on appeal. (*People v. Thompson* (2010) 49 Cal.4th 79, 121 [109 Cal.Rptr.3d 549, 231 P.3d 289]; *People v. Hart* (1999) 20 Cal.4th 546, 619 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

Waiver aside, appellant makes no showing that the prosecution intentionally elicited false testimony. (See, e.g., *People v. Rodriguez* (1994) 8 Cal.4th 1060, 1154 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Morrison* (2004) 34 Cal.4th 698, 716–717 [21 Cal.Rptr.3d 682, 101 P.3d 568].) In the words of defense counsel, Anderson-Seaquist "made things up as she went along." The trial court found that the prosecutor "didn't have a chance to investigate it

---

[3] The jury was instructed: "One of the expert witnesses, Janet Anderson-Seaquist was called by the prosecution and testified to matters that were outside of her area of expertise regarding memory, the effects of alcohol on memory and whether or not a person could later recall things that occurred when he or she was under the influence. I have stricken all of the testimony that she offered in this regard and have instructed you to disregard it." (See CALCRIM No. 332.)

and figure out that [Anderson-Seaquist] was going out on a limb she couldn't deliver on. So, I don't think [they] are co-conspirators in a bad science. . . ."

The jury was admonished to disregard the testimony about alcohol-related memory impairment. It is presumed that the jury followed the instructions and that it cured the error. (*People v. Price* (1991) 1 Cal.4th 324, 455 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Although a discovery violation did occur, it did not prejudice appellant or render the trial fundamentally unfair. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157, 106 S.Ct. 2464]; *People v. Riggs* (2008) 44 Cal.4th 248, 298 [79 Cal.Rptr.3d 648, 187 P.3d 363].)

Appellant argues that the prosecution repeatedly ignored the trial court's rulings in asking Officer Hall whether appellant violated any traffic laws before the collision. Appellant objected on the ground it called for a legal conclusion. The trial court sustained the objection and recessed for the day.

The next morning, Officer Hall was asked whether blocking a traffic lane is a Vehicle Code violation. The trial court sustained a relevancy objection. Officer Hall was next asked: "Is driving on the right shoulder of a roadway a violation of the California Vehicle Code?" Appellant objected on the ground it was an incomplete hypothetical and called for a legal conclusion. The trial court sustained the objection and no further questions were asked about Vehicle Code violations.

We reject the argument that the prosecution ignored the trial court's rulings to elicit inadmissible evidence. (See, e.g., *People v. Crew, supra*, 31 Cal.4th at p. 839.) Nor has appellant shown that the alleged misconduct affected the fairness of the trial so as to result in a denial of due process. (*People v. Riggs, supra*, 44 Cal.4th at p. 301.)

Appellant further argues that the prosecution engaged in misconduct in asking whether Matt Doyle and Rumi Koizumi lied about the prior drunk driving warnings. Appellant answered, "Yes."

The prosecution asked if Amanda Sebern "wasn't being truthful?" Appellant answered "Yes" after the trial court overruled an objection. Appellant was next asked if Sarah Cliffe, Julie Wilks, and Jessica Perez "weren't being truthful either?" Defense counsel objected.

The prosecution, at a sidebar conference, asked for clarification: "If the court would like me not to ask that question and believes I'm not allowed to ask it, I won't ask the question again." Counsel was ordered to refrain from asking whether "some other witness wasn't being truthful."

■ Appellant claims the prosecution failed to yield to the trial court's rulings and engaged in prejudicial misconduct. We disagree. It is settled that a criminal defendant can be asked whether prosecution witnesses are lying. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 98 [92 Cal.Rptr.3d 330, 205 P.3d 245].) "A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. . . . Were a defendant to testify on direct examination that a witness against him lied, and go on to give reasons for this deception, surely that testimony would not be excluded merely because credibility determinations fall squarely within the jury's province. Similarly, cross-examination along this line should not be categorically prohibited." (*People v. Chatman* (2006) 38 Cal.4th 344, 382 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

Defendant cites *People v. Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741] for the principle that a witness cannot testify about the veracity of another witness. But *Melton* "involved lay opinion from those who had no personal knowledge of the facts." (*People v. Chatman, supra*, 38 Cal.4th at p. 381.)

Appellant denied that anyone told her not to drink and drive, denied that she was offered a ride home, and denied that she stopped in the roadway with the engine running and the car in gear before the officers arrived. Appellant took the stand and put her own veracity at issue. "[She] urged that a number of witnesses should not be believed, but that [s]he should be. The jury had to determine whose testimony to credit." (*People v. Chatman, supra*, 38 Cal.4th at p. 383.) The "were they lying?" question was a method of confrontation to clarify appellant's position. (*Ibid.*)

Assuming, arguendo, that the questions were improper, there was no prejudice. (*People v. Crew, supra*, 31 Cal.4th at pp. 839–840; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [21 Cal.Rptr.3d 160].) The jury was instructed to disregard any question for which no answer was given and that "[o]nly the witnesses' answers are evidence. . . . Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (CALCRIM No. 222.) On review, it is presumed that the jury understood and followed the instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811].)

*Jury Selection*

Appellant argues that the trial court erred in not excusing prospective jurors who were biased. Appellant has not identified which prospective jurors were biased or cited to the 827-page transcript on voir dire. (Cal. Rules of

Court, rule 8.204(a)(1)(B) & (C).) Absent citation to the record, the alleged error is without foundation and forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406–407 [41 Cal.Rptr.3d 453]; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282–283 [188 Cal.Rptr. 123].) Appellant's assertion that the prosecutor "browbeat biased jurors into stating they could be fair" also lacks citation to the record. Our review of the voir dire indicates that the jurors demonstrated a willingness to set aside any preconceived notions and render a verdict based on the evidence presented. (*People v. Farley* (2009) 46 Cal.4th 1053, 1086 [96 Cal.Rptr.3d 191, 210 P.3d 361].)

■ Appellant complains that she was forced to use peremptory challenges to excuse biased prospective jurors. The loss of a peremptory challenge in this manner " ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' [Citations.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Appellant passed for cause several times and accepted the jury panel with three peremptory challenges remaining. Appellant did not claim that any juror selected to hear the case was biased and is precluded from raising the issue on appeal. (*People v. Millwee* (1998) 18 Cal.4th 96, 146 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949].)

Appellant's due process arguments are without merit. "[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension. [Citations.]" (*United States v. Martinez-Salazar* (2000) 528 U.S. 304, 311 [145 L.Ed.2d 792, 800, 120 S.Ct. 774]; see *Ross v. Oklahoma* (1988) 487 U.S. 81, 90–91 [101 L.Ed.2d 80, 91–92, 108 S.Ct. 2273] [no federal due process violation where state law forced use of a peremptory challenge to cure trial court's error in denying a challenge for cause].)

*Change of Venue*

■ The trial court denied a motion for change of venue both before and after the jury was selected. Appellant argues that the jury questionnaires and voir dire answers indicate that many prospective jurors were exposed to pretrial publicity or knew of the victim and could not be fair. Appellant, however, provides no citation to the record other than defense counsel's argument, which was disputed.[4] The prosecution noted that half of the jury pool "haven't heard anything about the case." This degree of exposure to

---

[4] Defense counsel argued that of the 96 submitted jury questionnaires, 58 percent of the prospective jurors said they had been exposed to media coverage. "The most troubling part is we have almost 30 percent, 28 of 96, . . . said they formed a preliminary opinion about the case, and they all had unfavorable opinions of Ms. Johnigan and the defense."

publicity is lower than that in reported cases in which a change of venue was denied. (See, e.g., *People v. Jennings* (1991) 53 Cal.3d 334, 359 [279 Cal.Rptr. 780, 807 P.2d 1009] [72 percent of sample recalled the crime, and 31 percent believed the district attorney had a very strong case against the defendant]; *People v. Coleman* (1989) 48 Cal.3d 112, 135 [255 Cal.Rptr. 813, 768 P.2d 32] [survey that 46.3 percent of public recalled the crime and 31 percent thought defendant was definitely or probably guilty].) " ' "[I]t is well-settled that pretrial publicity itself—'even pervasive, adverse publicity—does not inevitably lead to an unfair trial' [citation]." [Citation.] . . . [P]rejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire.' [Citation.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1086 [96 Cal.Rptr.3d 191, 210 P.3d 361].)

In ruling on a change of venue motion, the trial court considers the nature and gravity of the offense, the media coverage, the size of the community, the community status of the defendant, and the prominence of the victim. (*People v. Ramirez* (2006) 39 Cal.4th 398, 434 [46 Cal.Rptr.3d 677, 139 P.3d 64].) On appeal, appellant " 'must show both that the [trial] court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it was reasonably likely that a fair trial was not in fact had. The trial court's essentially factual determinations as to these factors will be sustained if supported by substantial evidence.' " (*People v. Fauber* (1992) 2 Cal.4th 792, 817 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Denying the change of venue motion, the trial court found "that we have a fair jury. The questionnaires bear [that] out . . . , the [jury] pool was a fair pool. . . ." It did not err. Appellant made no showing that a traffic fatality by an alcohol-impaired driver was a highly unusual crime that created a venue concern. (Cf. *People v. Jenkins* (2000) 22 Cal.4th 900, 943 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [change of venue denied in murder of police officer, a crime "of the gravest order"].) The opposition papers cited a Department of Alcoholic Beverage Control report that, in 2006, there were 1,597 alcohol-related fatalities in California, an average of more than four per day.

Appellant claims the media coverage was inflammatory but all but one of the news articles attached to the change of venue motion were published a year before the trial. It was a significant lapse of time and diminished the significance of the media coverage. (See, e.g., *People v. Jenkins, supra*, 22 Cal.4th at p. 944 [lapse of 10 months between publication and trial weighed against change of venue].) Appellant conceded that "[t]he publicity has been conclusionary" and one of the articles talked "about, 'The alleged killer.' That was one of the recent articles. It's not sensational."

None of the jurors selected stated that their fairness or impartiality would be affected due to the pretrial publicity or the nature of the charged offense. "It is not necessary that jurors be totally ignorant of the facts and issues involved in the case; it is sufficient if they can lay aside their impressions and opinions and render a verdict based on the evidence presented in court. [Citation.]" (*People v. Fauber, supra*, 2 Cal.4th at p. 819.)

Nor did the size of the community require a change of venue. Santa Barbara County has more than 400,000 people and is the 18th most populous county in California. Appellant characterized Santa Barbara County as "small," but its relative size weighed against the motion for change of venue. (See, e.g, *People v. Howard* (1992) 1 Cal.4th 1132, 1167 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [Tulare County, which ranked 20th in size with 253,000 inhabitants, was not a small community for change of venue purposes]; *People v. Webb* (1993) 6 Cal.4th 494, 514 [24 Cal.Rptr.2d 779, 862 P.2d 779] [population of San Luis Obispo County, a "moderately sized" county, a neutral factor in motion for change of venue].)

Although the victim was well known in the law enforcement and equestrian communities, there is no evidence that her status or prominence in the community at large required a change of venue. (See, e.g., *People v. Hart* (1999) 20 Cal.4th 546, 599 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Criminal cases against celebrities such as Michael Jackson have been tried in Santa Barbara County in the same courthouse. (See *People v. Jackson* (2005) 128 Cal.App.4th 1009, 1014 [27 Cal.Rptr.3d 596].) Nor did appellant's race (African-American), community status, or length of residency in the county (five years) weigh in favor of changing venue. (See, e.g., *People v. Howard, supra*, 1 Cal.4th at p. 1167.) Appellant did not exhaust her peremptory challenges, a further indication that appellant believed the jury would be fair and impartial. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1252 & fn. 5 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Our review of the record convinces us that the change of venue motion was properly denied. (*People v. Farley, supra*, 46 Cal.4th at pp. 1086–1087.) The case does not fall "within the limited class of cases in which prejudice would be presumed under the United States Constitution." (*People v. Prince* (2007) 40 Cal.4th 1179, 1217 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

*Conclusion*

■ Appellant's remaining arguments have been considered. They merit no further discussion. Having reviewed the record, we conclude that none of the alleged errors, either singularly or cumulatively, were prejudicial or

denied appellant a fair trial. "A defendant is entitled to a fair trial, not a perfect one. [Citation.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 454 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

The judgment is affirmed.

Coffee, J., and Perren, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 28, 2011, S195318.