Filed 10/14/15  P. v. Barajas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C075010 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF 12-3530) |
| v. | |
| REYES BARAJAS, | |
| Defendant and Appellant. | |

Defendant Reyes Barajas appeals his convictions for two counts of second degree murder and two counts of gross vehicular manslaughter while intoxicated.  He contends the trial court erred by denying his motion to exclude statements made while he was being booked into county jail and, by admitting these statements, violated his *Miranda*[1]

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

rights. Even if the trial court erred in admitting the statements, we conclude any error was harmless beyond a reasonable doubt and affirm the judgment.

## FACTUAL BACKGROUND

Defendant, his wife Ann Marie Miller, and their teenage son, Marco, were in Lake County visiting family over Labor Day weekend 2012. That Monday, they went to Anne Marie's mother's house and stayed until about 2:30 or 3:00 p.m. Defendant drank beer throughout the day. He regularly drank more than five beers. When they left, defendant was driving his Toyota pickup truck. Neither Marco nor Ann Marie had a driver's license.

At approximately 5:00 p.m., Franky Gonsalves was driving on Highway 16 and noticed debris on the road. Looking further, he saw a pickup truck down an embankment lying on its side. Gonsalves drove to a fire station to get help. When he returned, he learned there were three people inside the truck. Defendant was the driver. He was hanging by the driver's seat belt. Marco was hanging from a seat belt in the backseat area of the truck. Ann Marie was in the front passenger area lying beneath the male driver. Defendant was groaning, but unconscious and unresponsive. Another passerby cut defendant loose from the seat belt to keep him from strangling. Defendant's wife and son died as a result of injuries sustained in the crash.

California Highway Patrol (CHP) Officer Gregory Aston was the first officer to arrive at the scene. He saw the truck 40 to 50 feet down the embankment, wedged on its side against a tree. Upon questioning by Officer Aston, defendant denied driving, claimed nobody had been driving, and the vehicle had not gone off the roadway. The paramedics who assisted defendant informed Officer Aston that defendant smelled of alcohol. That fact, and the nature of the accident, led Officer Aston to suspect the case could involve driving under the influence (DUI). He informed Officer Eduardo Garcia of that suspicion.

2

When Officer Garcia arrived at the scene, he saw defendant lying on a backboard on the south shoulder of the roadway, with injuries to his face and the left side of his body, as well as to both of his arms. Officer Garcia asked defendant what had happened, he answered, "Nothing." When asked who was in the truck with him and who was driving, he said, "No one." Officer Garcia concluded defendant was the driver of the truck, in part because of an injury to his left shoulder area which was consistent with a driver's side seat belt. A helicopter transported defendant to Santa Rosa Memorial Hospital for treatment to his injuries.

CHP Officer Juan Inguanzo interviewed defendant at the hospital. He immediately smelled alcohol coming from defendant. Defendant claimed not to remember being in a collision. He also claimed he had not been driving. He initially told Officer Inguanzo he left his Redwood City home at approximately 4:00 or 5:00 p.m., drove to a friend's house, then drove to a hospital and admitted himself for treatment of a disease. He then told another story, saying he left his Redwood City home at approximately 11:00 a.m., drove to a different friend's house in San Jose, where he drank some beer, then drove to Santa Rosa to admit himself to a hospital for a disease. In his third statement, he claimed he left his Redwood City home at 7:00 a.m. and drove to his in-laws home, arriving at approximately 9:00 a.m. He claimed not to remember anything after that. Defendant initially said he had not been drinking at all, and then said he had two beers between 9:30 and 10:00 p.m. the night before.

Officer Inguanzo administered field sobriety tests, including a horizontal gaze nystagmus test. Repeatedly, he had to remind defendant to move only his eyes, not his head. He demonstrated a finger count field sobriety test. Defendant could not follow his instructions. The results of both tests were consistent with alcohol impairment. Officer Inguanzo administered two preliminary alcohol screening tests. The first, at 7:45 p.m. and the second, four minutes later. The tests showed blood-alcohol levels of 0.111 percent and 0.112 percent. In the first test, defendant was blowing too softly into the

3

mouthpiece to maintain a tight seal, so Officer Inguanzo used a manual "trap function" to get a result. Both results were consistent with alcohol impairment. Officer Inguanzo arrested defendant.

Under the implied consent law, defendant elected to have a blood test. The results showed a blood-alcohol level of 0.13 percent. A person with a 0.13 percent blood-alcohol level cannot safely drive a motor vehicle. Based on alcohol absorption rates, a criminalist for the California Department of Justice estimated that at the time of the accident defendant's blood-alcohol level would have been between 0.16 and 0.19 percent. To reach that level of intoxication, a person would have to drink nine and a half 12-ounce beers. With that level of intoxication, a person would not be capable of driving safely, particularly on a winding rural highway.

After Officer Inguanzo drew defendant's blood, he advised defendant of his *Miranda* rights. Officer Inguanzo informed defendant there were passengers in the car. Defendant accused him of lying. Officer Inguanzo told defendant his wife and son were in the truck and that they had sustained fatal injuries. Defendant responded, "It is what it is."

Dr. Allen Cortez treated defendant at the hospital. He observed multiple injuries: defendant's left eye was bulging, swollen and bleeding, he was missing teeth, had lacerations on his forehead and scalp, and a possibly fractured left elbow. Defendant was awake but confused. He had a concussion. Upon admission to the hospital, defendant said he drank one to two beers a day, and he had his last drink at 2:00 p.m. that day. Another blood-alcohol test taken during his admission showed a blood-alcohol level of 0.13 percent. Dr. Cortez did not recall whether paramedics administered medication to defendant during transport to the hospital.

Two days later, defendant was released from the hospital. Officer Garcia transported him to the Yolo County jail for booking. During booking, a jail nurse and a correctional officer questioned defendant as part of the medical intake screening

4

procedure. Officer Garcia was present during the process but did not question defendant. In response to intake questioning, defendant said he drank two or three beers a day and had his last beer on Monday morning (the day of the accident). When asked about what had happened, he said "they had rolled." The nurse asked defendant when the accident happened, and he told her it happened on Monday between 3:00 p.m. and 4:00 p.m. He said he did not experience alcohol withdrawals. He also said he lost consciousness after the vehicle rolled. Every inmate being booked into county jail is subjected to screening for medical problems. The standard form includes questions about alcohol and drug consumption, accidents, and loss of consciousness. The jail nurse and correctional officer utilized the intake screening form in their questions, but some of the questions they asked went beyond the information sought on the form.

Steve Ruppert, a CHP accident reconstruction expert, investigated the scene. He concluded the truck rolled and slid across the road before careening down the embankment. He noted there was no evidence the truck was braking while on the road, instead, the accident resulted from the driver consciously hard steering to the left, causing the vehicle to "yaw," then rotate and flip. He estimated the truck was traveling at least 75 miles per hour when it began to skid. A person under the influence of alcohol could not safely drive on that road, at that speed. The speed limit in that section of road is 55 miles per hour. Officer Garcia testified he never exceeds 40 miles per hour at that part of the road, because the curve is dangerous.

Christopher Lee, a criminalist in alcohol forensics, testified a blood-alcohol content (BAC) of 0.08 renders a driver too impaired to drive. When defendant's blood was drawn, it yielded a BAC of 0.13. BAC usually drops over time, so defendant's BAC would have been 0.19 at the time of the accident. An individual with a 0.13 BAC could not drive safely. To reach a 0.13 BAC, a person would have to consume six to seven beers. To reach a 0.19 BAC a person would have to consume nine and a half beers.

Defendant was convicted of a DUI in 2007 and completed an 18-month drinking driver program. The program included instruction on the hazards of drunk driving, through videos, group sessions, and counseling. Defendant was again convicted of DUI in 2009. He completed another 18-month education program. As part of these programs, defendant signed and dated an acknowledgement that he understood driving under the influence of alcohol is extremely dangerous to human life.

PROCEDURAL HISTORY

An information charged defendant with two counts of murder (Pen. Code, § 187, subd. (a)),[2] and two counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)). As to the vehicular manslaughter counts, the information further alleged defendant had two prior convictions for driving under the influence. (Veh. Code, § 23152, subd. (b)).

Prior to trial, defendant moved to exclude the statements he made while he was in custody and after he invoked his *Miranda* rights. Specifically, he sought to exclude the statements made in response to questions asked as part of the medical intake screening procedure. Following an evidentiary hearing, the trial court denied his motion.

The jury found defendant guilty as charged on all four counts. In bifurcated proceedings, the trial court found true the allegations defendant had prior convictions for violating Vehicle Code section 23152, subdivision (b), in 2007 and 2009. The trial court sentenced defendant to two consecutive terms of 15 years to life, one each for the two second degree murders, for an indeterminate term of 30 years to life in state prison. The court imposed and stayed two terms of 15 years to life, one each for the vehicular manslaughters.

---

[2]     Undesignated statutory references are to the Penal Code.

6

Defendant contends the trial court erred in admitting the statements he made in response to questioning when he was booked into the county jail.  He claims these statements fell outside the booking exception to *Miranda*, as the questions were not "confined to legitimate booking questions," and the questions should have been reasonably expected to evoke incriminating responses.[3]  We find no prejudicial error.

The *Miranda* rule generally requires exclusion of statements made by a defendant while being subjected to custodial interrogation without provision of *Miranda* warnings. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86 (*Andreasen*).)  However, under the booking exception to the *Miranda* rule, the authorities need not provide *Miranda* warnings prior to asking routine questions related to health or safety concerns that arise during the arrest or booking process.  (*Andreasen, supra,* at p. 87; *People v. Williams* (2013) 56 Cal.4th 165, 174, 187-189 [*Miranda* not triggered by prison intake question about reason for defendant's request for protective custody]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827-828 [*Miranda* not triggered by arrest question related to defendant's medical condition]; *People v. Gomez* (2011) 192 Cal.App.4th 609, 634-635 [*Miranda* not triggered by routine booking question about gang affiliation designed to ensure safety of jail placement].)  However, a *Miranda* interrogation may emerge during routine exchanges if the authorities ask questions " ' "that are designed to elicit incriminatory admissions." ' [Citation.]" (*People v. Williams, supra,* at p. 187; *Andreasen, supra,* at p. 87.)

---

**3**      Appellant claims this issue is "nearly identical" to the one in *People v. Elizalde* (2013) 222 Cal.App.4th 351 (S215260) which was pending before the California Supreme Court when his opening brief was filed.  As in *Elizalde*, we find any error harmless, as other properly admitted and unchallenged evidence convincingly established every element of the offense.  (*People v. Elizalde* (2015) 61 Cal.4th 523, 533-534.)

"In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.  [Citation.]  Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]."  (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 630-631.)  However, "[t]he fact that the information gathered from routine booking questions turns out to be incriminating does not, by itself, affect the applicability of the exception.  [Citations.]"  (*Id.* at p. 629.)

We need not determine whether the questioning here crossed the line from routine fact gathering information to questions designed to elicit incriminatory admissions in violation of *Miranda.*  The alleged error, if any, in admitting appellant's statement was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *Arizona v. Fulminante* (1991) 499 U.S. 279, 306-310 [113 L.Ed.2d 302, 329-331]; *People v. Johnson* (1993) 6 Cal.4th 1, 32-33.)

Initially, the statements defendant complains about are:  (1) he drank beer the day of the accident; (2) he typically drank two to three beers a day; (3) he was in an accident and his truck rolled; (4) he was driving the truck; and (5) he lost consciousness.  This evidence did not come before the jury exclusively through defendant's statements.  During admission to the hospital, defendant said he drank one to two beers a day and had

8

his last beer the afternoon of the accident. He does not challenge on appeal the admission of that statement into evidence. Defendant's mother-in-law also testified defendant regularly drank more than five beers at a time and had been drinking the day of the accident, before the family left her home. Witnesses at the scene of the accident said defendant was unconscious when they found him after the accident. He was hanging from the driver's seat belt. His injuries were consistent with being the driver. Lastly, the accident reconstruction expert described the accident and concluded the truck rolled down the embankment. Thus, the evidence in every statement defendant complains about was also admitted through other witnesses.

Furthermore, even without defendant's statements during the medical intake, the evidence against defendant was overwhelming. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187.) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Malice may be implied when defendant, "knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*).) California courts have long recognized that a traffic fatality caused by a grossly intoxicated motorist may support a conviction for second degree murder. (*Id.* at pp. 300-301; see *People v. Autry* (1995) 37 Cal.App.4th 351, 358, and cases cited therein.) " 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental facilities with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Watson, supra,* at pp. 300-301; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1090.) Implied malice can be established by evidence that appellant had: "(1) a blood-alcohol level above the .08

9

percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated;" and (4) engaged in "highly dangerous driving." (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.) These are not required elements, but factors to provide guidance on appellate review. (*People v. Johnigan, supra,* at p. 1091.) Moreover, proof of a predrinking intent to drive is not an essential element of a vehicular murder conviction, "[t]he criminal act underlying vehicular murder is not use of intoxicating substances in anticipation of driving, but is driving under the influence with conscious disregard for life." (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988-989.)

The evidence established Ann Marie and Marco died as a result of the injuries they sustained in the accident. It was undisputed that defendant was driving the truck. Ann Marie did not have a driver's license. Marco was too young to drive. Witnesses at the scene of the accident found defendant suspended by the driver's seat belt. His injuries were consistent with his having been the driver. Because Ann Marie and Marco could not drive, defendant knew he had to drive. He well knew the dangers to his family of drinking and driving. He drank anyway. Multiple tests showed defendant with a blood-alcohol level between 0.111 and 0.13. An expert testified that at the time of the accident, defendant's blood-alcohol level would have been between 0.16 and 0.19 and he would have had to have consumed between six and nine and a half beers to reach that level of intoxication. Not only is that level of intoxication over the legal limit, well above the legal limit of 0.08, but an expert testified a person cannot drive safely when that impaired.

The accident reconstruction expert testified defendant was driving the car at speeds over 75 miles per hour, 20 miles over the speed limit. The expert and the CHP officer testified that driving at that speed on that road was dangerous. Officer Garcia, a peace officer and a highly skilled driver, said he never drove more than 40 miles per hour on that stretch of the road. Defendant lost control of the vehicle and his attempt to regain

10

control by consciously hard steering the vehicle caused it to roll, then skid off the road and plunge down the embankment.

Defendant had two prior DUI convictions, one in 2007 and one in 2009. After each of these convictions, he attended an 18-month education and counseling program, which included instruction on the dangers of drunk driving. After each of these programs, defendant signed and dated statements that he understood driving under the influence is extremely dangerous to human life. Attendance at educational classes following a DUI conviction and the signed statements after them support an inference of implied malice in a subsequent vehicular homicide where, as here, the person expressly learned from those programs about the risks to human life of driving while intoxicated. (*People v. Murray* (1990) 225 Cal.App.3d 734, 746; *People v. Brogna* (1988) 202 Cal.App.3d 700, 705; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532.)

On this record, there is no reasonable possibility these statements contributed to the jury's decision.

## DISPOSITION

The judgment is affirmed.

                                                              NICHOLSON     , Acting P. J.

We concur:

     MAURO        , J.

     DUARTE      , J.