Filed 11/17/14  P. v. Barragan CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B250550 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380162) |
| v. | |
| PETER RYAN BARRAGAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara R. Johnson, Judge.  Affirmed with directions.

Benjamin Steinberg for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Peter Barragan drove while under the influence and caused the death of one of his passengers. He appeals his conviction of one count of murder (Pen. Code, § 187), one count of driving under the influence and causing injury (Veh. Code, §23153, subd. (a)), and one count of driving with a blood alcohol content (BAC) over .08 percent and causing injury (Veh. Code, §23513, subd. (b)), with true findings that he caused great bodily injury (Pen. Code, § 12022.7, subd. (a)). He contends (1) insufficient evidence supports a second degree murder conviction based on implied malice; (2) the trial court erred in failing to instruct on vehicular manslaughter as a lesser included offense; (3) the trial court failed to properly instruct on the use of circumstantial evidence; (4) CALCRIM No. 520 on implied malice murder was internally inconsistent; (5) the prosecutor committed prejudicial misconduct; (6) his sentence on count 3 must be stayed pursuant to section Penal Code 654; and (7) the trial court erred in imposing an consecutive sentence on the great bodily injury enhancement when it imposed a concurrent sentence on the underlying felony. We affirm the judgment as modified.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Early in the morning of January 16, 2011, defendant was driving with Alyssa Leon, Job Ocampo, and Karina Ceballos westbound on Valley Boulevard. Defendant, who had consumed alcohol, was driving very fast and hit a monument at the intersection with Mission Road, causing his car to go airborne, hit a tree, and flip over. Alyssa Leon was killed in the accident.

*1. Information*

A three-count information filed May 5, 2011 charged defendant in count 1 with murder (Pen. Code, § 187, subd. (a)), in count 2 with driving under the influence and causing injury (Veh. Code, § 23153, subd. (a)), and in count 3 with driving with a blood alcohol content (BAC) over .08 percent and causing injury (Veh. Code, § 23513, subd. (b)). The information alleged as to counts 2 and 3 that defendant personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)).

2

## 2. *Prosecution Case*

### (a) The Accident and Investigation

On January 16, 2011, around midnight, Carlos Duran was at Lincoln Park, which is located next to Valley Boulevard. Duran was fishing. He saw a car coming down Valley Boulevard at a high rate of speed. Duran had a good view of Valley Boulevard, which is next to the park. The car was going back and forth between two lanes. It jumped the curb, hit a monument in the middle of the road, went airborne, and flipped over.

Duran ran to the car, and a man jumped out. Duran could hear whimpering from the car. A girl started crying, and he helped her and another man out of the car. Duran looked in the car and saw someone "that didn't make it." The two men were talking to each other but Duran could not hear what they were saying. Defendant was one of the men who got out of the car.

Phillip Bazurto was homeless and living in Lincoln Park at the time of the accident. He heard tires screeching and the noise of a car being smashed up. Bazurto saw concrete chunks flying through the air, and saw the car resting on its side. Bazurto went over to see if he could render assistance, and helped Duran get the people out of the car. Bazurto heard defendant say, "Tell them you were driving." The other man responded, "Fuck no. I'm not going to say that." Bazurto identified defendant from a six-pack.

Los Angeles police Officer Greg McMillan responded to the scene of the accident on Valley Boulevard. He observed the car on its passenger side, and deduced that it had been traveling westbound on Valley Boulevard towards Mission Boulevard. He saw a female partially ejected from the car who appeared to be deceased. There was a wide cone of debris in the street.

Officer McMillan spoke to defendant, who identified himself as the driver. Officer McMillan is trained to recognize the symptoms of persons who are under the influence of alcohol or drugs. Defendant had bloodshot, watery eyes and slurred speech. Officer McMillan's partner administered a preliminary alcohol screening test to defendant at 2:00 a.m. Defendant's result was .088. A test taken immediately thereafter was .087. Officer McMillan

3

did not conduct a field sobriety test because of defendant's need for medical treatment. Officer McMillan observed defendant at the hospital, and did not see him eat or drink anything.

Officer Manual Hernandez responded to the scene. He found a wallet underneath the car. Inside the wallet was a clear plastic baggie containing a white powdered substance. In the middle of the road there was also a baggie containing a leafy green substance resembling marijuana. Officer Hernandez also found in the debris field of the accident a portion of a glass pipe. The baggies were later determined to contain cocaine and marijuana.

Officer Lotus Leong responded to the scene, where she recovered an empty bottle of Jack Daniels about a car length away from the car. She also found an unopened bottle of Stella beer next to the car and a purple cloth bag containing a marijuana pipe.

Criminalist Aaron McElrea tested two blood samples taken from defendant at 2:30 a.m. Defendant's BAC in those samples was .091 and .092 percent. At .05 percent, there is an increase in the risk of being involved in a traffic collision; at .08 percent the risk is eight times more likely. In McElrea's opinion, defendant was under the influence at the time of the accident. The average elimination rate of alcohol from the body is .015 percent per hour. He could not estimate defendant's BAC at the time of the accident, nor could he say whether defendant was in the elimination phase at the time of the accident.

There is a large monument of a horse at the intersection of Valley and Mission Road. Defendant's car collided with the monument, went airborne, and traveled for 40 feet. The car hit a tree, which came through the floorboards where Ms. Leon was seated. The vehicle rolled several times on top of the tree. The tree and the car came apart.

The speed limit on Valley Boulevard is 40 miles per hour. Alyssa Leon was pronounced dead at the scene. She died from multiple traumatic injuries.

(b)     Events Leading Up to the Accident

Ryan Rivera lived with the victim Alyssa Leon, who was 21 at the time of the accident. At approximately 9:00 p.m. to 9:15 p.m., Alyssa left the house to visit her friend Karina Ceballos. Around 11:30 p.m., Alyssa returned with Ocampo and defendant. While they were at his house, Rivera did not see defendant drink or use any narcotics. They then left around 11:45 p.m., and when Alyssa kissed him goodbye, he could smell alcohol on her breath.

4

Around 4:00 a.m. he became worried because they had not come home. He called their cell phones and got no answer.

Isaiah (Sai) Saiopo lived in Carson at the time of the accident. Around 10:30 p.m. defendant, Alyssa, Ocampo and Karina came to his house. They had a bottle of Jack Daniels and a 12-pack of Stella Artois beer. He saw defendant and Ocampo drink beer, but did not see defendant drink any Jack Daniels. They were at his house a little over an hour and left at 11:30 p.m. Saiopo saw marijuana but did not recall anyone smoking it. He did not see anyone use cocaine. No one ate anything.

That evening, Ocampo was talkative and friendly, while defendant was quiet and seemed "kind of upset" as if something was bothering him. Defendant did not try to talk to anyone and would give one-word answers when spoken to. Defendant's eyes were not red or glassy.

When they left, defendant and Ocampo took the remainder of the beer and the Jack Daniels with them. It was the first time Saiopo had met defendant.

Karina Ceballos had seen Alyssa about 5:00 p.m. that day, having spent the whole day at Alyssa's house. They went to Saiopo's house at around 9:00 p.m. When they arrived at Saiopo's, defendant and Ocampo arrived with some Stella Artois beer. She saw defendant drinking beer, and believes he had one beer. She drove with Alyssa to Ryan's house at about 11:20 p.m., where they planned to drop off her car and get together with defendant and Ocampo. As they were driving towards Ryan's house, defendant was driving behind them. While she was getting onto the freeway, defendant sped past her and cut her off. She told Alyssa, "I'm going to get you home safe. I'm not going to drive like that."

After they got to Rivera's house, she and Alyssa went inside briefly and then got into defendant's car. Ocampo was in the front passenger seat. Defendant was driving. She took a shot of the Jack Daniel's that was in defendant's car. She did not see defendant drink any of the Jack Daniel's, and did not see him drink anything in the hour before the crash.

Defendant drove very fast. Ceballos was scared and told defendant to slow down three times. Defendant ignored her. She and Alyssa hung onto each other. Defendant was going about 80 to 85 miles per hour.

5

After the crash, she woke up and grabbed her leg. She had blood all over her. She was next to the car on the ground. She could see Alyssa lying on the floor with her head to the side. Alyssa was bleeding and lifeless. Ceballos had marijuana in her purse, but the purple bag found at the scene of the crash was not hers.

Earlier in the evening, Ocampo and defendant were at Ocampo's house in Norwalk around 9:00 p.m. Ocampo did not know whether defendant had anything to drink before he got to Ocampo's house. They planned to go to Saiopo's house. They stopped at a liquor store and picked up a 12-pack of Stella Artois beer. At Saiopo's house, Ocampo had two beers. He saw defendant drinking bourbon from a cup. He did not know if the cup had ice or soda in it. He was not certain whether it was bourbon, but it had a brownish-yellowish tint.

While at Saiopo's, Ocampo did not see defendant use marijuana or cocaine. He has known defendant nine years, and has driven with him hundreds of times. There was a refrigerator at Saiopo's house from which people were helping themselves to drinks.

The group's plan was to go to Hollywood, and they went to Alyssa's house. Ocampo did not see defendant drink anything while at Alyssa's house. While there, they used the restroom. Afterwards, they left in defendant's car. The music in the car was loud and he did not recall Alyssa telling defendant to slow down. Ocampo knew that defendant customarily drove fast. He did not recall how fast they were driving before the crash, but Ocampo did not believe defendant was speeding dangerously before the accident.

(c)     Defendant's Prior DUI

On March 12, 2010, defendant pleaded no contest to driving under the influence in violation of Vehicle Code section 23152, subdivision (b). He was placed on a 36 months probation requiring him to complete a driving under the influence program, and prohibiting him from operating a vehicle with a measurable amount of alcohol in his system.

At the crash scene, Detective Michael Kaden found some papers indicating that defendant had attended a drug and alcohol program named Adapt Aware Zone in Whittier. Robert Quinones, a drug and alcohol counselor and DUI facilitator works at Adapt in the City of Whittier. He provides court ordered alcohol programs that last from three to nine months. They instruct on the dangers of drinking and driving.

*3.    Defense Case*

Leo Summerhays testified for the defense that he was a DUI expert. He testified that defendant's blood alcohol level, based on the breath and blood tests administered, established that defendant's BAC could have been higher after the accident than at the time of the accident. At .08 percent or higher a person would be under the influence. Thus, he could not say that defendant was definitely under the influence at the time of the accident. To reach a BAC of .09, someone of defendant's size[1] would have to consume at least four beers or over five ounces of hard liquor. Alcohol is metabolized at the rate of .015 to .02 percent per hour. After the last drink is taken, the BAC rises between .01 and .04 percent to reach its peak.

In Summerhays's opinion, it would be impossible to ascertain defendants' BAC at the time of the accident, but he was confident it was less than .08 percent. Further, merely because a person is speeding and has alcohol in their system, the person is not necessarily under the influence of alcohol.

Another expert testified cocaine metabolite remains in the bloodstream for up to 40 hours. The quantity of metabolite does not reveal the dose of cocaine ingested.

*4.    Jury Verdict and Sentencing*

The jury found defendant guilty as charged on all three counts, and found true the great bodily injury enhancements as to Alyssa and Ocampo. The trial court sentenced defendant to a total of 18 years, consisting of 15 years to life on count 1, with a concurrent term of 16 months on counts 2 and 3, and a consecutive term of three years for the great bodily injury enhancement on count 2.

## DISCUSSION

**I.    Sufficiency of the Evidence:  Implied Malice**

Defendant contends there was insufficient evidence to support his conviction for second degree murder based on a theory of implied malice because he did not appreciate the risk involved in his conduct such that he knew he was putting his passenger's life in danger, but did not care. He challenges the evidence of his prior warning of the dangers of drinking

---

[1] Defendant is six feet tall and weighs 190 pounds.

7

and driving, the evidence of his attendance at a sobriety program, and the evidence of his intoxication, which only showed a BAC of .08 or .09 and no evidence of cocaine. We disagree.

Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. (See *People v. Watson* (1981) 30 Cal.3d 290, 300.) "California courts have long recognized that a traffic fatality caused by a grossly intoxicated motorist may support a conviction for second degree murder." (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1090.) In *Johnigan*, the court held that a defendant's prior DUI conviction or near miss with other vehicles can establish the defendant's awareness of the life-threatening risks of drunk driving. (*Id*., at p. 1090.) "[T]here is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice." (*Id*. at p. 1091.)

Implied malice can be established by evidence that appellant had: "(1) a blood alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated"; and (4) that appellant engaged in "highly dangerous driving." (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.) These are not required elements, but factors to provide guidance on appellate review. (*People v. Johnigan*, *supra*, 196 Cal.App.4th at p. 1091.) "[T]he state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)

Our review of this issue is limited. On appeal, we review the whole record to determine "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1022.) Evidence must be reasonable, credible and of solid value to satisfy the substantial evidence test, and "[t]his standard applies whether direct or circumstantial evidence is involved." (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

In the instant case there was substantial evidence of all four factors. First, defendant had a blood alcohol that tested on four occasions near the time of the accident at .08, the legal limit, and defendant had been observed drinking earlier in the evening; second, the group planned to go to Hollywood with defendant as the driver; third, defendant had a prior DUI and

he had taken a "first offenders" class on DUI's; and fourth, defendant engaged in highly dangerous driving by going at twice the speed limit.

## II. Lesser Related Offense of Vehicular Manslaughter

Recognizing that vehicular manslaughter is not a lesser included offense of second degree murder and thus no instructions on this issue were required, defendant contends instruction on the lesser related offenses of DUI manslaughter and gross vehicular manslaughter was necessary here because (1) the policy bases for prohibiting lesser related instructions do not apply here; (2) the prosecution should be deemed to have consented to the instructions; and (3) defendant had a federal constitutional right to an instruction on his theory of defense. Defendant argues the error was prejudicial under the *Chapman*[2] standard because the absence of manslaughter instructions put the jury in the bind of an all-or nothing choice between conviction or acquittal, even though they might have found he lacked the mental state for second degree murder.

### A. *Factual Background*

During trial, defendant requested jury instructions on voluntary manslaughter, involuntary manslaughter, and vehicular manslaughter. The court noted that the prosecution was not requesting any lesser related offenses and that the instructions defendant requested were not lesser included offenses of murder and denied the request. Defendant argued that if the court did not give the requested instructions, that would deprive him of a defense.

Defendant's plea form for his prior conviction for driving under the influence included the advisement that if he continued to drink and drive, such conduct was extremely dangerous to human life, and if he killed someone while driving under the influence, he could be charged with murder. Next to the advisement was a box for defendant's initials, but defendant merely put an "X" in the box although in the boxes for other advisements, he placed his initials.

Later, the court viewed the advisement and pointed out that an "X" was insufficient because the advisement of the consequences of a future accident while intoxicated had to be initialed. Defendant argued that there was no advisement and hence there was no evidence to

---

[2] *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705].

9

support implied malice. After observing that the instructions for implied malice do not require an advisement, the court excluded the advisement.

The prosecution then stated, "I believe the court had also mentioned some . . . additional options that would be available based on the court's ruling, and that would be to instruct on the lesser of gross vehicular manslaughter while intoxicated. And so, given the court's ruling, I believe that would be appropriate." The prosecution informed the court that it had agreed to a plea of gross vehicular manslaughter while intoxicated plus two great bodily injury counts, for a term of 16 years in prison, but defendant rejected the plea. In light of the court's ruling on the advisement form, the prosecution stated it would agree to the same plea but for a term of 12 years.

Defense counsel asked the court to clarify whether the prosecution was agreeing to the manslaughter instructions. The court responded, "[the prosecution] wants to add a count for him to plea[d] to. So it's a matter of settlement . . . . I'm not inclined to add a count just because . . . —the evidence hasn't changed as in terms of what the people's position has been, which is 187 or nothing. . . . Vehicular manslaughter, I've been trying to get that from the beginning. We had a whole list of arguments ahead of time when we were going over jury instructions, and the People were objecting, objecting, objecting. The case law says you don't have to add it. It's not a lesser included. So I'm not inclined to add it as a lesser included at this time. I will allow him to plead to it if he wants in terms of disposition, but that's about it."

After the verdict, defendant filed a motion for a new trial in which he argued that the court erred in refusing his manslaughter instruction request. The prosecution's opposition argued that it had objected to such instructions. The court denied the motion for new trial.

### B.      Discussion

The rules applicable to instructions on lesser related offenses differ significantly from the rules on lesser included offenses. Pursuant to *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*), a defendant has no right to instructions on uncharged lesser related offenses over the prosecution's objection, even if the evidence discloses that the defendant is at most guilty of the lesser crime.

10

### 1. Policy Argument

Defendant argues that *Birks*, *supra*, 19 Cal.4th 108 overruled *People v. Geiger* (1984) 35 Cal.3d 510 (*Geiger*), which had given defendants a unilateral right to lesser related instructions based on policy considerations. *Birks* stated, "In particular, we are persuaded that the concern for mutual fairness between defense and prosecution . . . is an important one, with independent foundation in California's law governing instructions on lesser offenses. The *Geiger* rule contravenes the principle of mutual fairness by giving the defendant substantially greater rights either to require, or to prevent, the consideration of lesser nonincluded offenses than are accorded to the People, the party specifically responsible for determining the charges. *Geiger*'s soundness is therefore suspect." (*Birks*, *supra*, 19 Cal.4th at p. 126.) Further, the prosecution focuses its resources on the stated charges, and "[o]ften evidence suggesting that the true crime, if any, is other than the charged or necessarily included offenses comes to light only in the course of trial, when the complete defense case is first revealed. The prosecution thus may suffer unfair prejudice when the trial evidence first suggests the lesser offense, and the defendant then has the superior power to determine whether instructions thereon shall be given." (*Id.* at p. 129.)

Here, defendant argues that the main issue was his mental state; consequently, lesser related instructions would not have forced the prosecution to alter its evidence or change strategies mid-trial. While we may agree with defendant's policy analysis of *Birks*, *supra*, 19 Cal.4th 108 that fairness is the lynchpin of its holding, we do not agree that every case requires us to conduct a fairness analysis. Rather, the *Birks* rule is a bright line rule. Unless the prosecution agrees, no lesser related instruction need be given. As discussed below, the prosecution here did not agree.

### 2. The Prosecution Did Not Consent to Such Instructions

Defendant argues that the prosecution should be deemed to have consented to the requested instructions. While *Birks*, *supra*, 19 Cal.4th 108 denied defendants a unilateral right to lesser related instructions, this does not foreclose the parties from agreeing the defendant may be convicted of a lesser offense not necessarily included in the charges. Where the parties consent, neither party can claim unfairness. Here, the prosecution stated its belief that a

11

manslaughter instruction was appropriate and also offered to amend the information; based on this, according to defendant, the prosecution should be deemed to have consented to the lesser related offense instruction.

We do not agree. Although the prosecution may have initially stated it thought a manslaughter instruction might be appropriate in light of the exclusion of defendant's plea form indicating the advisement on the consequences of drinking and driving, the record considered as a whole makes clear that the prosecution was only considering a lesser related charge in order to obtain a plea from defendant.

### 3. Constitutional Right to Instruction on Defense Theory

Defendant's last argument on lesser related instructions posits that *Birks* did not consider the federal constitutional implications of its ruling. However, we find that by arguing that the trial court's failure to instruct on lesser related offenses deprived him of his due process right to present a complete defense, defendant attempts to do indirectly what he cannot do directly, i.e., demand a jury instruction on an uncharged, lesser related offense. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1064–1065.) The California Supreme Court addressed a similar contention by holding: "An accessory instruction was not essential to defendant's defense. Through defendant's testimony and defense counsel's closing argument, the jury was fully apprised of the defense theories that it was [someone else] rather than defendant who [committed the charged offense]." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 213; see *Birks, supra*, 19 Cal.4th at p. 136, fn. 19 ["nothing in our holding prevents the defendant from arguing in any case that the evidence does not support conviction of any charge properly before the jury, and that complete acquittal is therefore appropriate"].) As the record in this case shows, the defense was not prevented from arguing to the jury that the prosecution had not proved implied malice by showing his lack of intoxication or lack of awareness of the consequences of his acts. Thus, the lack of an instruction on lesser related offenses did not deprive him of an adequate opportunity to present his defense.

### 4. No Prejudice From the Lack of Such Instructions

However, even if the trial court should have instructed the jury on involuntary or vehicular manslaughter, any error would have been harmless. An examination of the record

12

does not establish a reasonable probability of a more favorable result. (*People v. Breverman* (1998) 19 Cal.4th 142, 165; accord, *People v. Thomas* (2012) 53 Cal.4th 771, 814.)

"At least since 1981, when our Supreme Court affirmed a conviction of second degree murder arising out of a high speed, head-on automobile collision by a drunken driver that left two dead, California has followed the rule in vehicular homicide cases that 'when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied . . . .' [Citation.] In such circumstances, 'a murder charge is appropriate.' [Citation.] So-called implied malice second degree murder . . . is committed 'when a person does """an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life"' . . ." [Citations.] Phrased in a different way, malice may be implied when [a] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life.' [Citation.] '[A] finding of implied malice' . . . 'depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard.'" (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 109–110, quoting *People v. Watson* (1981) 30 Cal.3d 290, 296–297, 298, 300, italics & fn. omitted.)

The evidence in the instant case overwhelmingly supports a finding of implied malice. Defendant had a prior DUI, but unfortunately, he drove again after drinking. He drove with a blood alcohol content greatly in excess of the legal limit, and was speeding at 80 miles per hour, twice the speed limit, down a city street, before tragically ending the life of Alyssa Leon. Based on these facts, it is not reasonably probable a jury would have found in defendant's favor on the issue of implied malice, namely, that he did not appreciate the risk involved in his actions or that he did not act in wanton disregard for human life.

## III. Instruction on Circumstantial Evidence on Counts 2 and 3, Driving Under the Influence Causing Injury and Driving With a Bac Over .08, Causing Injury

Defendant contends that the trial court erred in failing to instruct the jury with CALCRIM No. 224 clarifying the proper use of circumstantial evidence. He contends the instruction was crucial because his BAC was not tested contemporaneously with the accident

and hence the main evidence of his guilt of these offenses was circumstantial. Defendant argues the error was prejudicial because the jury, faced with conflicting yet reasonable interpretations of circumstantial evidence, reduced the requirement of proof beyond a reasonable doubt as all tests showed defendant's BAC was near the threshold of .08; the absence of the instruction did not guide the jury to adopt a construction of the evidence more consistent with innocence.

### A. Factual Background

The trial court did not instruct with CALCRIM No. 224, and instead instructed with CALCRIM Nos. 223 (general instruction on direct and circumstantial evidence) and 225 (use of circumstantial evidence to find requisite intent or mental state).

CALCRIM No. 224 states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

### B. Discussion

The trial court has a sua sponte duty to instruct with CALCRIM No. 224 if the prosecution's case substantially relies on circumstantial evidence to establish any element of the charged offense. (See *People v. Heishman* (1988) 45 Cal.3d 147, 167.) The trial court is not required to instruct with CALCRIM No. 224 if the prosecution's evidence is direct or the circumstantial evidence is merely incidental to and corroborative of direct evidence. (*Heishman*, at p. 167.)

The issue here is defendant's level of intoxication. A person is guilty of violating Vehicle Code section 23153, subdivision (a) (driving under the influence) where the person:

(1) drives a vehicle "while under the influence of an alcoholic beverage . . . ; (2) when so driving, committing some act which violates the law [or fails] to perform some duty required by law; and (3) as a proximate result of such violation of law or failure to perform a duty, another person was injured." (*People v. Minor* (1994) 28 Cal.App.4th 431, 437–438; Veh. Code, § 23153, subd. (a).) Vehicle Code section 23153, subdivision (b) proscribes driving "while having 0.08 percent or more, by weight, of alcohol in his or her blood . . . and concurrently do[ing] any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver."

Here, even if the court erred in failing to instruct with CALCRIM No. 224, it does not follow that we must reverse the judgment. The trial court instructed with two other instructions on circumstantial evidence, CALCRIMM No. 223 (defining direct and circumstantial evidence) and CALCRIM No. 225 (proving intent or mental state with circumstantial evidence), which sufficiently covered the application of circumstantial evidence to defendant's theory of the case. Further, the failure to properly instruct on the sufficiency of circumstantial evidence is evaluated under the *People v. Watson* (1956) 46 Cal.2d 818 standard where, as here, the trial court instructed the jury on the People's burden to prove defendant's guilt beyond a reasonable doubt. (*People v. Rogers* (2006) 39 Cal.4th 826, 886.) Reversal is not warranted unless an examination of the entire cause shows it is reasonably probable the defendant would have achieved a more favorable result had the error not occurred. (*Watson*, at p. 836.) Given the overwhelming evidence of defendant's intoxication, it is not reasonably probable a different result would have obtained if the instruction had been given.

## IV. CALCRIM No. 520 Is Not Internally Inconsistent and Did Not Prevent the Jury From Determining the Essential Element of Deliberate Action on Count 1

Defendant contends CALCRIM No. 520 was internally inconsistent because it informed the jury that murder required a deliberate act yet at the same time provided that no deliberation was required to prove implied malice. He argues that such inconsistency resulted in a verdict that was not supported by a reliable finding of fact on this central element of second degree murder, in denial of his federal constitutional rights. He contends the error was

15

not harmless beyond a reasonable doubt because if one juror accepted the concept that defendant was guilty because he had some alcohol in his system, even if he did not intentionally intend to drink and drive. Finally, he contends the error was not forfeited by his failure to object because his substantial rights were affected.

As given here, CALCRIM 520 provided in relevant part: ""The defendant is charged . . . [with] murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant committed an act that caused the death of another person; and, two, when the defendant acted, he had a state of mind called 'malice aforethought.' [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice aforethought if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time that he acted, he knew his act was dangerous to human life; and, four, he deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time."

We review defendant's challenge to the implied malice instruction in light of well-settled principles. "We conduct independent review of issues pertaining to instructions." (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411.) When the defendant challenges the adequacy of the instruction as ambiguous or potentially misleading, our principal task is to determine """""whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution""""" or California law. (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) We determine the correctness of the challenged instruction "in the context of the instructions as a whole and the trial record," and not "'in artificial isolation.'" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [112 S.Ct. 475, 116 L.Ed.2d 385].) Thus, "'[t]he absence of an essential element in one instruction may be supplied by another or cured in light

16

of the instructions as a whole.'" (*People v. Burgener* (1986) 41 Cal.4th 505, 539; accord, *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

The Supreme Court has approved the use of language nearly identical to that appearing in CALCRIM No. 520. In *Watson*, *supra*, 30 Cal.3d 290, the Supreme Court held "second degree murder based on implied malice has been committed when a person does '"'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'" . . .' [Citations.]" (*Watson*, at p. 300.) Subsequent decisions have repeatedly reaffirmed this definition of implied malice. (*People v. Knoller* (2007) 41 Cal.4th 139, 152 [acknowledging earlier cases declaring "the 'better practice . . . is to charge juries . . . in the straightforward language of the "conscious disregard for human life" definition of implied malice,'" and noting "[t]he standard jury instructions thereafter did so"]; see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.)

Second, it is established "[m]alice aforethought as required in second degree murder is not synonymous with the term deliberate as used in defining first degree murder. [Citation.] To hold otherwise would obliterate the distinction between the two degrees of murder." (*People v. Washington* (1976) 58 Cal.App.3d 620, 624.) The Supreme Court has reaffirmed "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. [Citation.]" (*People v. Knoller*, *supra*, 41 Cal.4th at p. 151.)

Further, the term deliberation refers to the concept used in conjunction with premeditation that distinguishes first degree murder from second degree murder—first degree murder is, among other things, a killing that is willful, deliberate, and premeditated. (§ 189; *People v. Anderson* (1968) 70 Cal.2d 15, 25–26.) In that context, deliberation means "'"formed upon a *pre-existing* reflection."'" (*Id*. at p. 26.) Second degree murder does not require premeditation and deliberation, as CALCRIM No. 520 correctly states. However, as previously discussed, second degree murder based on implied malice does require a deliberately performed act, committed with knowledge the act poses a danger to life and with

17

conscious disregard of that danger. Thus, CALCRIM No. 520 is not internally inconsistent, and did not preclude the jury from determining an essential element of count 1.

## V.   Prosecutorial Misconduct

Defendant contends the prosecution denigrated defense counsel during closing argument by objecting to defense counsel's argument that defendant's BAC level was rising, not falling, after the accident, and during rebuttal by suggesting that defense counsel was "not intellectually honest" and counsel's goal was to confuse the jury. Although he acknowledges he did not object, he contends the comments were prejudicial because they infected the trial with such unfairness that he was denied due process.

### A.   *Factual Background*

Defendant argued in his defense that his BAC was rising after the accident, and thus that given it was .08 two hours after the accident, it must have been below the legal limit prior to the accident. During defense counsel's closing argument, the prosecution objected numerous times that defense counsel was misstating the law or arguing facts that were not in evidence. The court overruled the objections.

During rebuttal, the prosecution stated that defense counsel's goal was to confuse the jury, and that defense counsel had not been intellectually honest. "This idea of a rising blood alcohol content that he raised yesterday, this is not some brilliant concept that [defense counsel] came up with. This is a very run-of-the mill, typical defense. This comes up time and time again on these D.U.I. cases. Okay. When the facts are not on his side, he just argues rising blood alcohol. It's a default template. You can learn it at a seminar of how to defend a D.U.I. case. It's, like, right out of the D.U.I. Handbook 101. It doesn't fit the facts of this case. Okay. So don't buy it. [¶] . . . [¶]

"When the facts are not on your side, just say the word beyond a reasonable doubt over and over and over again in your closing arguments. Say it loudly. Argue that the blood alcohol content was on the [rise]. Pay a hired gun like Leo Summerhays, who, for x amount of dollars, will come in and say whatever it is you would like him to say for your case. And don't actually apply the principles that he sets forth. Just ignore the principles. Ignore the facts, and just try to confuse the jury and hope that they fall for it or hope that they're confused long

18

enough to buy it. Keep in mind the defense is also trying to play on your sympathies, trying to make you feel bad or sympathetic to the defendant, to disregard what the law provides for. He tries to mix up the elements, muddle up the facts, muddle up the law into a confusing state. . . . These are all typical defense tactics."

### B. Discussion

We need not consider whether the prosecution's arguments here are within acceptable limits. Objections to argument must be made in the trial court in order to be preserved on appeal. As defendant concedes, he did not object in the trial court and thus his arguments on appeal are forfeited. (*People v. Ervine* (2009) 47 Cal.4th 745, 806–807.)

## VI. Stay of Sentence on Count 3 Pursuant to Penal Code Section 654

Defendant contends sentence on count 3 must be stayed because both count 2 and count 3 were based on the same act of reckless driving and involved the same two victims.

A defendant may be convicted of, but not punished for, more than one crime arising out of the same course of conduct. (Pen. Code, §§ 654, 954.) Where Penal Code section 654 bars multiple punishments, the trial court stays execution of sentence for those convictions on which multiple punishment is prohibited. (*People v. Pearson* (1986) 42 Cal.3d 351, 359–360.) In sum, Penal Code section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

Here, defendant was convicted on count 2 of driving under the influence and causing injury (Veh. Code, § 23153, subd. (a)), and on count 3 of driving with a BAC level over .08 percent and causing injury (Veh. Code, § 23153, subd. (b)). The trial court imposed concurrent terms as to both counts. This was error, and sentence on count 3 should be stayed. (*People v. Duarte* (1984) 161 Cal.App.3d 438, 446–448 [proper to convict defendant of violating Veh. Code, § 21353, subd. (a) & (b), but sentence as to one count must be stayed pursuant to Pen. Code, § 654].)

## VII. The Consecutive Three-year Term on the Great Bodily Injury Enhancement

Defendant argues that the trial court erred in imposing a consecutive three-year term on the bodily injury enhancement imposed on count 2, and that the enhancement must be stayed because the underlying count was imposed concurrently.

We agree.  As explained in *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1310, it is inappropriate to impose a sentence on an enhancement but not on the underlying offense. "[A]n enhancement may not be imposed as a subordinate term of its own," and a trial court violates this rule by "imposing a concurrent term for the felony conviction and a consecutive term for the enhancement."  (*Id.* at p. 1311.)  Here, as the underlying count was imposed concurrently with count 1, the bodily injury enhancement may not be imposed consecutively and should have been stayed.

## DISPOSITION

The trial court is ordered to stay the sentence on count 3 and to stay the three-year enhancement for great bodily injury on count 2.  The court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.