Filed 2/17/15  P. v. Oakley CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B248796 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA080803) |
| v. | |
| PERRY OAKLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

While intoxicated, defendant Perry Oakley drove an Acura sedan through a stop sign and collided with a Toyota Camry, killing two of the Camry's passengers. A jury convicted him of two counts of second degree murder (Pen. Code, § 187, subd. (a)),[1] two counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), and one count each of leaving the scene of an accident (Veh. Code, § 20001, subd. (a)), driving under the influence causing injury (Veh. Code, § 23152, subd. (a)), and driving with an alcohol level of .08 or more causing injury (Veh. Code, § 23152, subd. (b)). The trial court found that he had suffered a prior strike conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), and sentenced him to a term of 82 years to life in state prison.

He appeals from the judgment of conviction, contending: (1) the evidence was insufficient to prove implied malice as required for second degree murder and (2) the trial court erred in (a) denying his pretrial *Miranda* motion to exclude statements he made to the police after the accident, (b) not adequately instructing the jury on the difference between implied malice and gross negligence, (c) admitting two autopsy photographs of the murder victims, and (d) sustaining a prosecution objection to defense counsel's hypothetical question regarding whether the stop sign at which defendant failed to stop would have been partially obstructed. We disagree with these contentions, and affirm the judgment.

## BACKGROUND

Around 11:00 p.m. on April 9, 2011, defendant drove an Acura sedan westbound on 141st Street in Los Angeles into the intersection at Normandie Avenue, failing to stop at the stop sign for his direction of traffic. There was no

---

[1] All unspecified statutory references are to the Penal Code.

stop sign for Normandie traffic, and a Toyota Camry driven by Ralph Payne, travelling southbound on Normandie, had just entered the intersection. Without honking, defendant's vehicle collided with the driver's side of the Camry, sending it into a nearby fence. There were four persons in the Camry: Payne, Dennis Vann (the front passenger), Samuel Dickens and six-year-old Sylvester Payne (the rear passengers). All of them were wearing seatbelts. Payne and Vann suffered serious, but non-fatal injuries that required extensive hospital treatment. Dickens and Sylvester Payne did not survive their massive blunt force injuries.

Lonnie Smith, an off-duty Los Angeles County Sheriff's Deputy, was inside his nearby home when he heard the crash and went to the scene. At the intersection of Normandie and 141st Street, he observed two Black males, one of whom he identified as defendant. He asked if they had been involved in the accident. They said they had, and gestured toward an Acura. Deputy Smith told defendant to sit down, and went to inspect the Acura. The Acura was empty; the four occupants of the Camry were still inside. When Deputy Smith looked back to where he had left defendant, defendant had vanished.

Gardena Police Officer Ryan Yee arrived at the crash scene. He saw only the Camry; the Acura was not there. He left to direct traffic at Normandie and Rosecrans, one block south of the accident. While there, defendant approached, waving his hands. He was limping, his hands were injured, and there was blood near an abrasion on his head. He told Officer Yee that he was driving his Acura and was involved in a car accident. Officer Yee noticed that defendant smelled strongly of alcohol and was slurring his speech. Asked if he had been drinking, defendant said that he had had two Heineken beers.[2] In response to questioning,

---

[2] A partial video and partial audio recording (with a transcript) of Officer Yee's interaction with defendant were admitted at trial. We have reviewed them.

3

defendant said that he was driving, and his passenger was a friend named Leon. He claimed that after the accident, someone pointed a gun at him and forced him inside a black Nissan Altima. Leon was able to escape. He was driven about three blocks and robbed. He managed to escape by running away. He did not ask about the occupants of the Camry he had struck, or seek medical aid for them. He appeared confused and had difficulty answering questions.

Gardena Police Officer Christopher Sanderson, along with his supervisor, Sergeant Freeman, also interviewed defendant at the scene.[3] He noticed that defendant smelled of alcohol. In response to questions by Sergeant Freeman and Officer Sanderson, defendant stated that he picked up Leon, and they went to a party at the home of Leon's sister-in-law on 141st Place around 7:00 p.m., where he drank two beers. He said that the Acura he was driving belonged to his brother and it was mechanically sound. He was driving home with Leon when he was involved in the accident. He initially said that he was traveling on 141st Place, and turned left. He then corrected himself, and said that he was not on 141st Place but on a back street. He did not think he was in the intersection when the accident occurred, and believed that the accident happened "[p]robably on the side street." He said that he turned left and "[t]here['s] a stop sign right there." After the turn, he did not remember anything. He later admitted that he remembered he "[h]it the car, and it was like what happened?" He said that he was in the Acura at the scene of the accident when the robbers told him to get out of the car. He claimed that he left the scene of the accident because of the robbery.

---

[3]     Videos and an audio recording (with transcript) of Officer Sanderson and Sergeant Freeman's interaction with defendant were admitted at trial. We have reviewed them.

4

Officer Sanderson had defendant perform several field sobriety tests, and also administered a preliminary alcohol screening (PAS) showing results of .132 at 1:25 a.m., and .131 at 1:27 a.m. (about two hours after the accident). Based on the PAS readings and defendant's poor performance on the field sobriety tests, defendant was arrested for driving under the influence. He was transported to a hospital, where his blood was drawn at 2:08 a.m. The blood alcohol reading was .12 percent. Later, at a second hospital, additional blood was drawn. That reading was .11 percent.

In Officer Sanderson's opinion, defendant was under the influence of alcohol when the accident occurred, and it was unsafe for him to drive. Using standard retrograde extrapolation theory, Criminalist Norm Fort testified that assuming a driver had PAS readings at 1:25 and 1:27 a.m. of .131 and .132, then earlier, at 11:30 p.m., the driver's blood alcohol level would be in the range of .14 to .15.

Gardena Police Officer Matthew Hassoldt, an accident reconstruction expert, examined the accident scene and found that nothing obscured the stop sign in defendant's direction at Normandie and 141st Street (though there was a large tree on the right of the sign), and no evidence that the Acura took any evasive action before striking the Camry. There were fresh gouge marks just west of a depression in the road near the stop sign, suggesting that the Acura was travelling fast enough to "bottom out" as it passed. The speed limit was 25 miles an hour (there was no posted sign). Based on a conservation momentum analysis, Officer Hassoldt determined that the Camry was traveling 27.69 miles an hour at the point of impact, and defendant's Acura was travelling 39.46 miles an hour. The Acura could not have reached that speed at impact had it stopped at the stop sign, nor

could it have created the gouge marks in the road. Based on his conclusions, Officer Hassoldt believed that defendant was at fault in the accident.

On December 26, 2001, a little more than nine years before the present accident, defendant pled no contest to driving under the influence (Veh. Code, § 23152, subd. (a)). He had been arrested three days earlier; two breathalyzer tests returned with blood alcohol readings of .18. As a result of his plea, defendant was placed on summary probation, and ordered to complete a three-month alcohol program (the HAM program). On May 29, 2002, defendant filed a certificate of completion of the program. Craig Harvey, who was Chief of Operations for the Los Angeles County Coroner and supervised the HAM program, testified that the program teaches first-time drunk drivers the consequences of drinking and driving, including that it can result in accidents causing death.

## DISCUSSION

### I. *Sufficiency of the Evidence*

Defendant contends that his second degree murder convictions must be reversed because the evidence was insufficient to prove implied malice. He is incorrect. Of course, in considering this contention, we view the evidence in the light most favorable to the judgment, and presume in support every fact that can reasonably be inferred from that evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

"[M]alice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson* (1981) 30 Cal.3d 290, 300.) "'[T]he state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt

6

or killed."'  [Citation.]"  (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092 (*Johnigan*).)

At base, defendant's contention rests on a misapplication of the substantial evidence standard and the mistaken notion that because his conduct was not as egregious as that of intoxicated drivers convicted of murder in other cases, the evidence here is insufficient to infer that he subjectively appreciated the risk to human life and consciously disregarded it.  However, in cases involving fatalities resulting from driving under the influence, courts have identified four factors as sufficient to infer implied malice:  "'(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.'  [Citation.]  Although defendant's conduct may not have been as egregious as that of the defendants in [other] cases . . . , sufficient evidence established each of those factors in the present case."  (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1114.)

First, defendant does not dispute that the evidence was sufficient to prove that he drove with a blood alcohol level above .08 percent.  Based on the expert opinion of Norm Fort, at the time of the accident defendant had a blood alcohol level of around .14 to .15.

Second, the evidence was sufficient to infer that he had a predrinking intent to drive.  According to his statements to Officer Sanderson and Sergeant Freeman, he picked up Leon in the Acura (which belonged to defendant's brother), went to a party on 141st Place, consumed alcohol, and was driving home from the party in the Acura when he collided with the Camry.  From this evidence, the jury could reasonably infer that before drinking, defendant intended to drive himself and Leon to and from the party.

7

Third, the jury could infer that he knew the hazards of driving while intoxicated. Following his prior conviction of driving under the influence, he completed the HAM program in May 2002, which included information on the risks of drunk driving, including the risk of collisions resulting in death.

Finally, defendant engaged in highly dangerous driving. Travelling at approximately 39 miles an hour in a 25 mile an hour zone, he ran an unobstructed stop sign, entered the intersection of 141st Street and Normandie, and collided with the Camry, making no attempt to avoid the collision. As he told Officer Sanderson and Sergeant Freeman, "[t]here['s] a stop sign right there," and after he "[h]it the car, . . . it was like what happened?", thus suggesting that he was totally surprised when he passed through the stop sign and struck the Camry. In short, "it took no leap of logic for the jury to conclude that appellant acted with conscious disregard of life and with wanton disregard of the near certainty that someone would be killed." (*Johnigan, supra*, 196 Cal.App.4th at p. 1092.)

## II. *Statements to the Police*

In the trial court, defendant moved to exclude the statements he made to Officer Yee after he approached the officer, and his later statements to Officer Sanderson and Sergeant Freeman before Officer Sanderson administered the field sobriety tests (FST's). He contended that he was in custody, that the officers failed to advise him of his *Miranda* rights, and that therefore all of his statements must be suppressed. The trial court denied the motion, determining that defendant was not in custody for *Miranda* purposes. On appeal, defendant contends that the trial court erred. We disagree.

8

a. *Evidence at the Hearing*

At the hearing on defendant's motion to exclude his statements, Officer Yee testified that he was controlling traffic at Rosecrans and Normandie, a block south of the collision site. No other officers were present there (though many were present at the accident scene a block away). Around 12:17 a.m., while Officer Yee was standing on the sidewalk, defendant approached, waved his hand in the air, and walked over. Defendant's hands were cut and bleeding, his legs appeared cut, and he was limping. Without being questioned, defendant volunteered that he had been robbed and involved in a traffic collision, He pointed in the direction of the accident. Officer Yee noticed that defendant smelled of alcohol and his speech was slurred. Defendant walked to a light standard at the corner and said he wanted to lean against something because his legs hurt.

As defendant leaned against the light standard, Officer Yee asked questions about the robbery and about the collision.[4] He informed defendant that he was "not under arrest or anything. You're not in handcuffs, all right? We just want to get the story straight." At some point, other officers arrived, and one patted defendant down for weapons. In response to Officer Yee's questions, defendant said that at gunpoint the robbers drove him to a location away from the collision and took his cell phone and jewelry. Officer Yee told defendant that he "want[ed] to find out who has the gun. . . . I ain't trippin' about no [traffic collision]." As to the collision, defendant said that he was driving an Acura with his friend Leon and

---

[4]     A 20 minute video (without audio) of the initial portion of Officer Yee's interaction with defendant was played at the hearing. While testifying, Officer Yee explained relevant portions of the video. This video is not part of the record on appeal. However, part of Officer Yee's conversation with defendant was recorded by another officer. A transcript of that conversation was used at the hearing and is part of the record on appeal. We have reviewed it.

9

struck another car. Officer Yee asked defendant if he had been drinking, and defendant replied that he had had two Heineken beers.

One of the other officers took photographs of defendant's injuries, and fire department paramedics arrived and spoke to him. Based on his observations, Officer Yee called Officer Sanderson, who specialized in DUI investigations, to come to the scene. They waited another 15 minutes or so for Officer Sanderson to arrive.

A video of the wait for Officer Sanderson, taken by the camera on Officer Yee's patrol car, was played.[5] It showed defendant leaning against the light standard at the street corner. Officer Yee stood casually to the left of defendant, and his partner (Officer Bergeron) stood to the right. Officer Yee left to focus the camera on his vehicle, and then returned. A third officer (Sergeant Freeman) arrived and spoke briefly to defendant, then talked on his cell phone, and walked away. During the wait for Officer Sanderson, the officers behaved informally, e.g., folding their arms, adjusting their belts, putting their hands in their pockets, conversing with one another. There was no overt display of authority.

Although Officer Yee estimated that he was with defendant for about 45 minutes before Officer Sanderson arrived, he also testified that Officer Sanderson arrived around 12:45 a.m. (which is 28 minutes from 12:17, when defendant first approached him). Lonnie Smith accompanied Officer Sanderson. In a field show up, Smith identified defendant, who was still leaning against the light standard, as one of the two men he had seen next to the Acura at the accident scene. Officer Yee told Officer Sanderson that defendant smelled of alcohol and had admitted driving the Acura. Officer Sanderson approached defendant as Officer Yee, his partner, and two or three other officers stood nearby and chatted with each other.

---

[5]     This video is part of the record on appeal, and we have viewed it.

Officer Sanderson asked defendant his name, and what happened. Defendant said that he had come back "over here" after being robbed. Officer Sanderson then asked questions concerning defendant's activities throughout the day and night, including questions concerning what he did at the party at the home of Leon's sister-in-law and how much he had drunk. Defendant answered each of the questions, and said that leaving the party he was involved in the accident. Officer Sanderson asked how much defendant had drunk at the party, and defendant replied two beers.

Sergeant Freeman, who was still present, then asked defendant about the Acura. Defendant said that it was his brother's car, but he drove it and was responsible "lately" for the maintenance. He said that it ran "fine," and the brakes and headlights worked. Sergeant Freeman questioned defendant about whether he had any medical problems or had taken any medication or smoked any marijuana. Defendant said that he had no medical problem (except apparently asthma), had taken no medication and had not smoked marijuana.

Next, Sergeant Freeman asked what happened in the crash. Defendant said that he picked up Leon, and they went to a party at the home of Leon's sister-in-law on 141st Place around 7:00, where he drank two beers. He was driving home with Leon when he was involved in the accident. He initially said that he was traveling on 141st Place, and turned left. He then corrected himself, and said that he was not on 141st Place but on a back street. He did not think he was in the intersection when the accident occurred, and believed that the accident happened "[p]robably on the side street." He said that he turned left and "[t]here['s] a stop sign right there." After the turn, he did not remember anything. He later admitted that he remembered he "[h]it the car, and it was like what happened?" He said that he was in the Acura at the scene of the accident when the robbers told him to get

11

out of the car.  Defendant described being forced from the Acura and into the robber's vehicle at gunpoint.  He was driven to a location where his jewelry was stolen.  During this questioning, defendant was never told that he had to answer questions, and he appeared extremely calm.

Officer Sanderson then had defendant perform several field sobriety tests, and administered the PAS tests, after which he arrested defendant.  He estimated the arrest occurred about 20 to 25 minutes after he first arrived.

b.  *Defendant Was Not in Custody*

*Miranda* warnings are required only when a defendant is subject to custodial interrogation, meaning an interrogation that occurs when "'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]  Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ""'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'"' [Citation.]  [¶] . . . When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

On appeal (as in the trial court) defendant fails to specify a particular point at which his interaction with the police was transformed into custodial interrogation.  Given that he contends *all* statements to the police should have been excluded, he implicitly contends that he was in custody by the time he made his

12

first statements to Officer Yee. He appears to concede that his initial encounter with Officer Yee was consensual, and yet asserts that based on the length of his detention, the varying number of officers present, and the type of questions he was asked, custody occurred from the outset and continued through Officer Sanderson and Sergeant Freeman's questioning. We disagree.

"Whether a person is in custody is an objective test: the pertinent inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [Citation.] The totality of the circumstances is considered and includes '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect. [Citation.]" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 971-972.)

Here, the totality of the circumstances defeats the notion that defendant was in custody at any relevant time after he approached Officer Yee. Defendant was not formally arrested until after he completed the FST's. The record is not entirely clear as to the precise duration of defendant's interaction with the police. Officer Yee testified on the one hand that defendant approached him at 12:17 a.m., and that Officer Sanderson arrived around 12:45, a period of 28 minutes. According to Officer Sanderson, he spent about 20 to 25 minutes with defendant before he was arrested, thus suggesting that the entire interaction between defendant and the police lasted a total of 53 minutes. On the other hand, Officer Yee also estimated

13

that he spent 45 minutes with defendant before Officer Sanderson arrived, which (with the 20 to 25 minutes Officer Sanderson estimated) would suggest that the entire interaction lasted perhaps as long as 70 minutes. However, we note that the last portion of Officer Sanderson's interaction with defendant consisted of defendant performing the FST's, during which he was not interrogated and made no incriminating statements. Thus, the FST period of the interaction is irrelevant to whether defendant was in custody when he was questioned.

Regardless, although the detention was not brief, the record supplies ample explanation for the delay. Defendant's interaction with the police began not with him being detained, but with him voluntarily approaching Officer Yee. He appeared injured, and volunteered that he had been involved in an accident and been robbed. Officer Yee questioned defendant about both the robbery and the accident, being more concerned about, and thus asking more questions about, defendant's report of an armed robbery than the accident. An officer photographed defendant's injuries, and paramedics arrived and examined him. Officer Lee summoned Officer Sanderson to perform a DUI investigation because Officer Sanderson specializes in such investigations. It took Officer Sanderson approximately 15 minutes to arrive. Once he arrived, he and Officer Freeman conducted a DUI investigation and questioned defendant about the robbery. In short, under the circumstances, there was no unnecessary delay in completing the investigation of defendant's purported robbery and his driving under the influence. Further, there was no suggestion that defendant believed the questioning would "continue until he provid[ed] his interrogators the answers they [sought]." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 438 (*Berkemer*).)

The location of the questioning was not coercive. It was a public street corner. Defendant was not told where to stand; he chose to lean against a light

14

standard.  He was never asked to move until Officer Sanderson had him perform the FST's.  (*Berkemer, supra,* 468 U.S. at p. 438 ["exposure to public view [of a traffic detention] both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"].)

The ratio of officers to defendant varied, with perhaps as many as five officers present at one time or another, and at times two or three officers stood in a semicircle at a distance, facing and to the sides of defendant.  But the demeanor of the officers was informal, and the questioning was never accusatory.  Officer Yee told defendant that he was not under arrest, and that he "want[ed] to find out who has the gun. . . .  I ain't trippin' about no [traffic collision]."  Officer Sanderson and Sergeant were likewise not aggressive or intimidating in their questioning.  At no time was he told that he was not free to leave.  Other than a pat down for weapons during his interaction with Officer Yee, none of the officers touched defendant until the FST's were administered by Officer Sanderson.  Defendant appeared calm throughout the interaction.

Examining these factors in totality, we conclude that defendant was not in custody for *Miranda* purposes.  In other words, he was not "subjected to restraints comparable to those associated with a formal arrest."  (*Berkemer, supra*, 468 U.S. at p. 441.)  In reaching this conclusion, we find the decision in *People v. Forster* (1994) 29 Cal.App.4th 1746, instructive.  There, the defendant was stopped at 9:25 p.m. by a customs officer while reentering the United States from Mexico at the San Ysidro Point of Entry.  As the defendant responded to routine questions, the customs officer formed the opinion that he was under the influence.  The officer asked the defendant to exit his car, and then accompanied him to the customs security office, where the officer patted the defendant down for weapons and told

15

him to sit on a bench. The customs officer then contacted the California Highway Patrol to investigate whether the defendant was driving under the influence. (*Id.* at p. 1750.) A CHP officer arrived at 10:20 p.m., spoke to the customs officer, and then contacted the defendant at 10:30 p.m. (*Id.* at pp. 1750-1751.) The CHP officer asked the defendant to approach a counter, and asked questions concerning an injury to the defendant's ear (defendant said he had been in a fight), and questions concerning the defendant's drinking and activities throughout the prior day (the defendant said that he had drunk four beers beginning at 8:00 that morning). The officer had the defendant perform several field sobriety tests, after which he was arrested. (*Id.* at p. 1751.)

The Court of Appeal upheld the trial court's determination that the defendant was not in custody for *Miranda* purposes when questioned by the CHP officer: "Forster [the defendant] had not been arrested. . . . [T]he detention was a relatively long one, a little more than an hour. However, there is a reasonable explanation for that delay, namely, it took that long for the CHP officer to arrive at the San Ysidro Port of Entry and it was necessary to wait for the CHP officer's arrival because customs officers do not investigate driving under the influence cases. . . . Forster was detained in a public area of the customs office; he was neither restrained nor handcuffed in any fashion. Forster sat quietly on a bench and was not addressed by any officer during this interval. . . . [T]he record does not indicate how many customs officials were present in the customs office or if there were other people being detained at the same time as Forster. Finally, . . . we do not discern any overbearing demeanor from either [the customs or CHP officer]; nor does their questioning appear to be compulsive in any sense. Thus, we are left with one factor that supports Forster's position, namely the hour-plus detention. However, in deciding . . . the custody issue for purposes of *Miranda*, it is the

16

totality of circumstances that is relevant; 'no one factor is dispositive.' [Citation.] And this one factor -- length of detention -- is rationally explainable here. Therefore, given the absence of objective indicia of arrest and considering the totality of the circumstances, we conclude that while Forster was most definitely detained in the customs office, he was not in custody for *Miranda* purposes." (*People v. Forster, supra*, 29 Cal.App.4th at pp. 1753-1754, fn. omitted.)

Similarly in the instant case, the length of defendant's interaction with the police is rationally explained by the circumstances involved. While the record here shows that several officers were present off and on during questioning, the officers did not act coercively at any time, and never physically restrained defendant (other than when he was patted down). Based on these and the other factors we have identified, we conclude on the totality of the circumstances, despite the length of defendant's interaction with the police and the number of officers present, defendant was not in custody for purposes of *Miranda*. Therefore, the trial court did not err in denying defendant's motion to exclude his statements.

III.    *Instructions*

The trial court instructed the jury on murder and gross vehicular manslaughter while intoxicated pursuant to the pattern instructions, CALCRIM Nos. 520 (murder) and 590 (manslaughter). Defendant contends that the trial court erred in giving these instructions, because they do not explain that the implied malice required for second degree murder includes a subjective awareness of risk, whereas the gross negligence required for vehicular manslaughter does not.

Defendant concedes that CALCRIM Nos. 520 and 590 "are not incorrect statements of the law," but asserts that they should have been supplemented by an additional instruction explaining the difference between the subjective and

17

objective standards used to determine implied malice on the one hand and gross negligence on the other. However, in the trial court he failed to request such an instruction, and therefore he has forfeited the contention. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000-1001 [holding absent a request, trial court had no duty to give a clarifying instruction that an objective standard of provocation applies to reduce murder to voluntary manslaughter, but not to reduce first to second degree murder].)

In any event, the claim is meritless. Using CALCRIM No. 520, the trial court instructed the jury in relevant part that to prove murder, the People must prove that "[w]hen the defendant acted, he had a state of mind called malice aforethought." The court instructed that "[t]he defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. *At the time he acted, he knew his act was dangerous to human life; AND* [¶] *4. He deliberately acted with conscious disregard for human life*." (Italics added.)

Using CALCRIM No. 590, the court instructed in relevant part that to find defendant guilty of gross vehicular manslaughter while intoxicated, the People had to prove that the defendant committed an infraction while driving, and that he did so "with gross negligence." The court defined gross negligence as follows: "Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. *He or she acts in a reckless way that creates a high risk of death or great bodily injury; AND* [¶] 2. *A reasonable person would have known that acting in this way would create such a risk.* [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in

18

the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." (Italics added.)

We do not see how these instructions reasonably give rise to any confusion. For murder, the prosecution had to prove that defendant had a particular "state of mind," which included knowledge that his act was dangerous to human life and that he deliberately acted with conscious disregard for human life. For gross vehicular manslaughter, the prosecution had to prove that defendant acted in a manner that recklessly created a high risk of death or great bodily injury, and "that a reasonable person would have known that acting in this way would create such a risk." The subjective standard applicable for implied malice (the "state of mind" requiring knowledge of the risk to human life) was clear, as was the objective standard required for gross vehicular manslaughter (reckless conduct that a reasonable person would have known created a risk to human life).

Defendant contends that a clarifying instruction was needed to correct misstatements by the prosecutor in her opening argument equating implied malice to gross negligence. But the two comments to which he refers, viewed in context, do not support the notion that the prosecutor equated the subjective standard of implied malice to the objective standard of gross negligence. The prosecutor initially described defendant's conduct as not mere "gross negligence, he . . . exercised general disregard for the safety of others, which you'll hear about in a minute. It's called implied malice. That wasn't ordinary negligence. It was extreme negligence." The prosecutor then discussed each of the elements of implied malice. In discussing whether defendant intentionally committed an act, the prosecutor began: "[T]he act that he committed started before he even got to the party. The implied malice and the conscious disregard he showed for the safety of others happened before he left his home that day [because he knew that he was

19

going to drive to the party, drink, and then drive away]. . . . He made a conscious decision to ignore the dangers [and] his responsibility as a driver." In arguing that "[a]t the time the defendant acted he knew his act was dangerous to human lives," the prosecutor argued that defendant's knowledge that his act was dangerous was proven by defendant's prior conviction of DUI and his completion of the HAM program, his conscious choice to drive while under the influence, his flight from the scene of the accident, and his false story of being robbed. We find nothing in the relevant comments of the prosecutor that might have misled the jury into believing that implied malice, unlike gross negligence, did not require a subjective awareness of the risk to human life.

IV. *Photographs*

Defendant contends that the trial court erred in admitting two autopsy photographs of the murder victims over his objection under Evidence Code section 352. We disagree.

Before opening statements, defense counsel objected under Evidence Code section 352 to the prosecutor using any autopsy photographs of the murder victims, Samuel Dickens and Sylvester Payne. The prosecutor responded that she intended to use one photograph of each victim in examining Ralph Payne. Defense counsel argued that the victims could be identified by means other than use of the photographs. The trial court examined the two photos in issue, and described them for the record: "These photographs are essentially from the chest up. . . . It looks like they have . . . a breathing tube . . . in their mouths. They just look like they're asleep. I don't believe that the prejudicial effect . . . outweighs the probative value. Your motion is denied." Thereafter, in examining Ralph Payne the prosecutor

20

showed him the photographs.  He testified that they depicted  Dickens and Sylvester, and that they were alive before the photographs were taken.

The trial court did not abuse its discretion.  "'"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.  [Citations.]  The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.  [Citations.]"'" (*People v. Montes* (2014) 58 Cal.4th 809, 862.)  On appeal, defendant inaccurately describes the photographs as "gruesome."  We have examined the photographs. As the trial court rightly described them, they depict only the shoulders and faces of the victims, with their eyes closed.  They show no obviously fatal injuries.  Each victim has white tape securing a tube in his mouth.  Given that they depict the deceased victims, they are not pleasant, but they are far from gruesome and inflammatory.  The prosecution used the photographs for the limited purpose of identifying the victims as being alive before the photographs were taken.  We conclude that the trial court correctly determined that the probative value of the photographs was not substantially outweighed by their prejudicial effect.

V.    *Witness Lonnie Smith*

Lonnie Smith, who lived in the area of the accident, testified that there was shrubbery on the north side of 141st Street approaching Normandie that had been cut back since the time of the accident.  Defense counsel asked:  "At the time of the accident, . . . if I had been driving west down on 141st Street . . . towards Normandie, the shrubbery that was trimmed back, that would have partially obscured the stop sign as I approached the intersection; correct?"  The trial court

sustained the prosecutor's objection on the ground of speculation. Defense counsel did not try to rephrase the question and did not return to the topic.

On appeal, defendant assigns this ruling as error. It is not. In posing this abbreviated hypothetical question, defense counsel left too many variables unstated for any answer to be relevant regarding the circumstances of the instant collision, such as the supposed speed he was traveling, the distance at which the stop sign purportedly became "partially obscured," and what he meant by "partially obscured" (would the stop sign be unrecognizable as such? Was he referring only to the posted sign or also the white lettering in the street?) Any response to the question would have had no tendency in reason to prove or disprove a material fact in the case, and was therefore irrelevant. (Evid. Code, § 210.)

We note, further, that even if the ruling was erroneous (it was not), defendant cannot show prejudice on this record. First, we cannot know what the response might have been. Second, defendant told Officer Sanderson that before the accident he turned left and "[t]here['s] a stop sign right there." Third, Officer Matthew Hassoldt, the prosecution's accident reconstruction expert, examined the accident scene and testified that nothing obscured the stop sign in defendant's direction at Normandie and 141st Street (though there was a large tree on the right of the sign). Under these circumstances, any error was clearly harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

**DISPOSTITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P.J.


We concur:


MANELLA, J.


COLLINS, J.