Filed 2/13/26  P. v. Vargas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> REYES SEBASTIAN VARGAS, <br><br> Defendant and Appellant. | H051344 <br> (Monterey County <br> Super. Ct. No. 20CR007001) |

Defendant Reyes Sebastian Vargas was convicted by jury of 19 counts relating to child sexual abuse and sentenced to 110 years to life in prison.  On appeal, he challenges the trial court's admission of expert testimony about child sexual abuse.  He also alleges prosecutorial misconduct in cross-examining defendant and in arguing that the complaining witnesses had no motive to lie.  With respect to his sentence, defendant contends his trial counsel was ineffective for failing to object to various fines and fees based on inability to pay.  He also asserts that his lengthy prison term constitutes unconstitutional cruel or unusual punishment.  We reject his arguments and will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

Defendant was charged with nine counts of sexual intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a); counts 1, 3, 5, 7, 10, 12, 14, 16, and 18; unspecified statutory references are to the Penal Code), five counts of lewd acts involving children (§ 288, subd. (a); counts 2, 4, 6, 8, and 9), and five counts of

forcible lewd acts involving children (§ 288, subd. (b)(1); counts 11, 13, 15, 17, and 19). It was alleged among other things that defendant committed the lewd acts against more than one victim. The alleged victims were identified as Jane Doe 1 and Jane Doe 2, and are the granddaughters of defendant's wife A.V. (Consistent with rule 8.90 of the California Rules of Court, and to protect the victims' privacy, we refer to A.V. by her initials.)

## A. DOE 1'S ALLEGATIONS

Doe 1 was 15 years old at the time of trial. When she was six or seven years old, she spent weekends with A.V. and defendant at their home. Defendant spoke Spanish and Doe 1 did not, so she did not talk to him. A.V. sometimes left Doe 1 alone with defendant.

On one occasion when Doe 1 was six years old, she was in the bathroom when defendant came in and started touching her. Defendant turned Doe 1 around, pulled her pants down, bent her over, and tried to put his penis in her anus. Doe 1 did not think defendant's penis "fit" inside her anus, but felt it "hurt a lot." She "started crying" and defendant "stopped."

Another time, when Doe 1 was six or seven years old, she was napping alone in her grandmother's bedroom. Defendant came into the room, got into the bed with Doe 1, and pulled her pants down. He put his penis in her vagina "until white stuff came out."

Two other incidents happened when Doe 1 was seven years old. While she was playing in a tent in the backyard, defendant entered the tent and put his penis in Doe 1's vagina "for a little bit" until A.V. "called him" and he "went inside." Another time, defendant and Doe 1 were alone together in the backseat of a car. Doe 1 was wearing a dress. Defendant unzipped his pants, removed Doe 1's underwear, and put his penis in her vagina. He eventually stopped, opened the car door, and ejaculated.

Doe 1 and her family moved away when she was about seven years old. A few years later, when she was about 11 years old, she visited A.V. and defendant. Doe 1,

2

A.V., and defendant all slept together in the same bed.  While A.V. was asleep, defendant "started touching [Doe 1's] leg."  He first touched her feet, then "started going higher and higher."  Doe 1 started crying and A.V. woke up.  A.V. and defendant drove Doe 1 to the hotel where her parents were staying.  Doe 1 cried at the hotel and told her father "she had a bad nightmare."  Her mother testified that Doe 1 "was crying a lot" and "wouldn't stop shaking."

In January 2020 (two months before Doe 1's 12th birthday), Doe 1's father noticed a pornographic website in the internet history on his cell phone, which was also used by his children.  When he asked Doe 1 about it she started to cry and she told her father what had happened with defendant.  Later that day, she told her mother that defendant had "touched her using his fingers."  Doe 1's mother "felt like there was still more" that Doe 1 had not told her.

### B.  DOE 2'S ALLEGATIONS

Doe 2 was 21 years old at the time of trial.  She and Doe 1 are cousins, but they did not have a close relationship.  Doe 2 described five incidents involving defendant.

Doe 2 testified that when she was six years old, she and her family were living with A.V. and defendant.  While Doe 2 (who did speak Spanish) was in the living room with her younger brother, defendant asked her if she wanted to play a game.  Defendant took Doe 2 into her grandmother's bedroom, put her on the bed, and started touching her legs.  Doe 2 told defendant to stop, but he did not listen.  He removed her pants and underwear and put his penis in her vagina, then moved it back and forth while holding her hands down and her legs open.  Eventually defendant made "a grunting noise," stopped, and went to the bathroom.  Doe 2 was bleeding from her vagina, and there was a "slimy … clearish type of liquid" on her underwear.  Defendant told Doe 2 that if she told her mother, Doe 2 would be taken away and defendant "would cut [her] tongue out."

On another occasion Doe 2 was in her bedroom with her brother.  Defendant came into the room and told Doe 2 to come with him.  When Doe 2 refused, defendant picked

3

her up and carried her to A.V.'s bedroom. Doe 2 tried "pushing him with [her] legs" and "kicking him," but defendant "was too strong." He threw her on the bed, removed her pants, and put his penis in her vagina. Defendant again moved his penis back and forth, holding Doe 2 down with his hands and using his knees to hold her legs open. Like the first time, defendant eventually stopped and went to the bathroom. He reminded Doe 2 "to not say anything."

The third time, Doe 2 was in the living room with her brother when defendant grabbed her. Doe 2 tried to resist by "kicking him, hitting him" and "holding on to the doorway" of A.V.'s bedroom. Defendant pulled her off the door, removed her clothes, and put his penis in her vagina. Doe 2 "didn't want to think about it" and "the blinds were open," so she "just laid there" and "looked outside to get distracted" until defendant stopped and went to the bathroom.

Defendant did the same thing two more times, but Doe 2 did not remember the fourth and fifth incidents as well as the first three. The fourth time, Doe 2 was with her brother in A.V.'s bedroom when A.V. left for work. Defendant came in, sent Doe 2's brother out of the room, and tried to grab Doe 2. She resisted at first but then stopped and "went back [to] looking out the window" while defendant put his penis in her vagina. Defendant eventually grunted, got up, and went to the bathroom. The fifth time, defendant again put his penis in Doe 2's vagina in A.V.'s bedroom. Defendant was on top of Doe 2 and she felt "suffocated." Doe 2 did not resist. After defendant finished, Doe 2's uncle came home. Defendant got up quickly, helped Doe 2 get dressed, and went into the bathroom.

In early 2020 (when Doe 2 was 18 years old), Doe 2's mother was talking on the phone with her brother (an uncle of Doe 1 and Doe 2). He told her what Doe 1 had said about defendant. Doe 2 was in the same room as her mother and overheard the conversation. Her mother expressed shock and disbelief about Doe 1's allegations, then

4

saw that Doe 2 was crying.  Doe 2 told her mother that defendant had done the same thing to her.

## C. Expert Testimony

A psychologist testified as an expert on "the psychological effects of child sexual assault."  He discussed "myths and misconceptions that people have about kids who have been sexually abused."  For example, people "don't necessarily understand why a child may actually enjoy being with their perpetrator or actually seek out being with that person."  People also "expect kids to appear really sad or angry, or outward signs of distress when talking about sexual abuse, when in fact, most kids don't show those outward displays, even when talking about something traumatic like that."  The expert testified it is common for children to delay disclosing abuse until "months, years," or "even a decade or so" later, one possible reason for delayed disclosure being that children are often abused by someone close to them.  Children may disclose abuse incrementally over time.  They may also compartmentalize the abuse and appear to be "living their life normally, even when something bad is happening in their life."

According to the expert, children may develop behavioral, cognitive, or emotional coping mechanisms to deal with abuse.  They "might walk around the house a little differently, try to avoid certain areas of the house, wear an extra pair of pajamas to bed," or "pretend they are sleeping if the perpetrator is walking into the room at night[.]"  Some children "will say, I just froze, or I just let it happen to get it over with."  Other children report that "while the abuse is happening, they stare off into the corner of the room and just space out or numb out" to avoid thinking about it.  That process, known as "disassociation," also helps explain "why kids may not recall certain details of the abuse."  The expert opined that if abuse happens when children are very young, they may be unable to remember certain details when disclosing the abuse years later.

## D. DEFENSE CASE AND PROSECUTION REBUTTAL

Defendant's wife, A.V., testified that he never babysat Doe 1 or Doe 2 alone. She and defendant were Jehovah's Witnesses and would often bring Doe 1 with them on their door-to-door ministry work, but Doe 1 was never left with defendant alone in the car. A.V. did not have a good relationship with Doe 2's mother (A.V.'s daughter). They had an argument in November 2019 and did not speak again until Doe 2's mother called A.V. to tell her about Doe 2's allegations against defendant. Doe 2 had been involved in the argument between her mother and A.V.

Numerous character witnesses, including church members and friends of A.V. and defendant, testified that defendant was an honest man who would not sexually abuse or threaten children. Defendant also testified on his own behalf. He denied the allegations and said he was never alone with Doe 1 or Doe 2.

A detective who had interviewed defendant testified as a rebuttal witness for the prosecution. In the interview, defendant first denied ever babysitting A.V.'s grandchildren before acknowledging that he had sometimes spent short periods of time alone with them.

## E. VERDICT AND SENTENCING

The jury found defendant guilty on all 19 counts. It also found true the allegations (attached to counts 2, 4, 6, 8, 9, 11, 13, 15, 17, and 19) that defendant committed the offenses against multiple victims.

The trial court sentenced defendant to an aggregate term of 110 years to life in prison, consisting of fully consecutive terms of 25 years to life on counts 1 and 10 and fully consecutive terms of 15 years to life on counts 13, 15, 17, and 19. Concurrent terms of 25 years to life terms were imposed on counts 3, 5, 7, and 9. Punishment on counts 2, 4, 6, 8, 11, 12, 14, 16, and 18 was stayed under section 654. The court imposed various fines and fees including a $9,500 restitution fine; $1,230 in sex offense fines and fees; a $760 court operations assessment; and a $570 court facilities assessment.

6

## II. DISCUSSION

### A. NO ERROR IN ADMITTING EXPERT TESTIMONY ON CHILD SEXUAL ABUSE

Defendant contends the trial court abused its discretion and deprived him of due process by admitting general expert testimony about the psychological effects of child sexual abuse. The admitted testimony did not expressly refer to Child Sexual Abuse Accommodation Syndrome (CSAAS), a term frequently used in other cases to describe similar evidence, as the trial court considered the term "no longer appropriate." But as the admitted testimony covered the same topics and served the same purpose as CSAAS evidence (i.e., dispelling possible misconceptions about victims' reactions to child sexual abuse), we will treat it as such and analyze its admissibility accordingly. (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 215 (*Ramirez*).)

CSAAS evidence has long been admissible in California for the limited purpose of rehabilitating a complaining witness when the defendant asserts the witness behaved inconsistently with having been abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) Nonetheless, defendant suggests the California Supreme Court "has not directly held that CSAAS evidence is admissible in California" and urges us to find it inadmissible. He cites various out-of-state authorities deeming CSAAS evidence inadmissible on grounds including scientific unreliability. (E.g., *State v. J.L.G.* (N.J. 2018) 234 N.J. 265; *Blount v. Commonwealth* (Ky. 2013) 392 S.W.3d 393; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557.) But notwithstanding defendant's characterization of the applicable precedent, the California Supreme Court clearly expressed in *McAlpin* its view that CSAAS evidence is admissible for the limited purpose it served here: to correct common misconceptions about abuse and to explain reported behavior. That courts in other states may disagree with the reasoning or outcome in *McAlpin* does not change the decision's binding effect in California cases. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Munch* (2020) 52 Cal.App.5th 464, 468.)

7

Defendant challenges the conclusion reached by intermediate courts in *Munch* and other recent cases that *McAlpin* remains binding decades later. He asserts that while CSAAS evidence may have been necessary to dispel common misconceptions about child sexual abuse at the time *McAlpin* was decided, those misconceptions are no longer so prevalent as to justify its continued admissibility. We find no factual support for his assertion in this record. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172.) We conclude that under applicable California precedent and based on the record here, the trial court did not abuse its discretion by admitting the expert testimony. Nor did admission of the testimony deprive defendant of due process. (*Id.* at p. 174.)

## B. THE PROSECUTOR DID NOT COMMIT MISCONDUCT

While cross-examining defendant, the prosecutor asked him several questions about whether Doe 1 and Doe 2 would have a motive to tell lies about him. Defendant answered by denying the complaining witnesses' allegations, but did not suggest any reason why the witnesses may have lied. In his closing argument, the prosecutor mentioned the lack of any apparent motive to lie. Defendant argues the prosecutor's questions and comments constituted prejudicial misconduct, and alternatively asserts his trial counsel was ineffective for failing to object on that basis.

As defendant acknowledges in citing *People v. Chatman* (2006) 38 Cal.4th 344, 384, so-called "were they lying" questions are not categorically improper in California. (Here again, defendant relies in part on out-of-state authorities deeming similar questions improper, but we are bound to follow California Supreme Court precedent.) Nor do we find the prosecutor's conduct improper under the circumstances presented here. Defendant put his own truthfulness at issue by testifying and denying the allegations. The jury was tasked with determining whether to credit his testimony or that of the complaining witnesses, and posing limited "were they lying" questions was a permissible method of confrontation bearing directly on the witnesses' credibility. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1097.) In contrast to *People v. Zambrano* (2004)

8

124 Cal.App.4th 228, a case cited by defendant in which "were they lying" questioning about law enforcement witnesses was deemed misconduct, defendant personally knew the witnesses referenced in the prosecutor's questions and could reasonably be expected to opine about their possible motives to lie.

Even assuming misconduct and a corresponding duty to object, defendant was not prejudiced. The two complaining witnesses, who the evidence suggests did not have a close relationship, provided very consistent accounts of sexual abuse by defendant. We see no reasonable probability of a different trial result had defendant's unilluminating answers to the prosecutor's "were they lying" questions been removed from the jury's consideration, or had the prosecutor not referenced that theme in closing argument.

## C. NO DEFICIENCY IN NOT OBJECTING TO FINES AND FEES

Defendant argues his counsel should have asserted his inability to pay the fines and fees imposed (including a $9,500 restitution fine, $1,230 in sex offense fines and fees, a $760 court operations assessment, and a $570 court facilities assessment). To establish ineffective assistance of counsel in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) Deficient performance will be found only if the record affirmatively demonstrates counsel had no rational tactical purpose for the challenged act or omission. (*Ramirez*, *supra*, 98 Cal.App.5th at p. 226.)

The California Supreme Court recently issued a decision about when a court must consider a defendant's ability to pay before imposing fines, fees, and ancillary costs. (*People v. Kopp* (2025) 19 Cal.5th 1.) The decision in *Kopp* does not affect our analysis here because even if defendant was entitled to a hearing regarding his ability to pay, the record does not foreclose the possibility that counsel had a rational purpose for not raising the issue. As a different panel of this court noted on a similarly silent record in

9

*Ramirez, supra*, 98 Cal.App.5th at p. 226, counsel "may have had access to information about defendant's financial status, including the possibility of his earnings while in prison, that would make such an objection unsuccessful." We thus conclude defendant has not met his burden to show ineffective assistance of counsel. (*Ibid.*)

### D. THE SENTENCE IS NOT UNCONSTITUTIONAL

The trial court sentenced defendant to an aggregate prison term of 110 years to life. Defendant contends the sentence amounts to cruel or unusual punishment prohibited by the Eighth Amendment to the United States Constitution and article 1, section 17 of the California Constitution. Because defense counsel did not object to the sentence on constitutional grounds, defendant alternatively asserts his counsel provided ineffective assistance.

"The power to define punishment for crimes is a legislative function, so we proceed with deference when there is a constitutional challenge to the length of a prison term." (*People v. Cortez* (2025) 114 Cal.App.5th 1201, 1215.) A punishment is unconstitutional under the Eighth Amendment only if it is "grossly disproportionate to the severity of the crime." (*Rummel v. Estelle* (1980) 445 U.S. 263, 271.) Similarly, a punishment is considered cruel or unusual under the California Constitution only if it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Relevant considerations include "(1) the nature of the offense and the nature of the offender with regard to the degree of danger both present to society, (2) a comparison of the punishment with the punishments prescribed for more serious crimes in the jurisdiction, and (3) a comparison of the punishment with punishments for the same offense in other jurisdictions." (*People v. Guenther* (2024) 104 Cal.App.5th 483, 532–533, citing *In re Lynch*, at pp. 425–427.)

Defendant argues his aggregate sentence is effectively life in prison without the possibility of parole, but the analogy does not support his constitutional claim. In

*Harmelin v. Michigan* (1991) 501 U.S. 957, the United States Supreme Court upheld the constitutionality of a life sentence without the possibility of parole for possession of approximately 1.5 pounds of cocaine. California courts have also consistently upheld the constitutionality of prison sentences even longer than defendant's in cases involving multiple sex crimes against child victims. (E.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230–1231; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531–532.)

Although defendant notes that his aggregate sentence exceeds the statutory penalty for non-special-circumstance first degree murder (25 years to life), the comparison is misplaced. The jury found defendant committed numerous acts of sexual assault against two victims beginning when they were six years old. That his aggregate punishment for those crimes exceeds the hypothetical punishment for a single act of murder does not render it unconstitutionally cruel or unusual. (*People v. Cooper* (1996) 43 Cal.App.4th 815, 826.) For that reason, defendant also cannot show that his counsel was ineffective for not making that argument at sentencing.

### III.    DISPOSITION

The judgment is affirmed.

_____

Grover, Acting P. J.

**WE CONCUR:**


_____

Lie, J.


_____

Wilson, J.


H051344
*People v Vargas*